NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2281-16T4

MEPT JOURNAL SQUARE URBAN
RENEWAL, LLC, MEPT JOURNAL
SQUARE TOWER NORTH URBAN
RENEWAL, LLC, and MEPT JOURNAL
SQUARE TOWER SOUTH URBAN
RENEWAL, LLC,

     Plaintiffs-Respondents,

v.

THE CITY OF JERSEY CITY,

     Defendant-Appellant.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| **August 9, 2018** |
| **APPELLATE DIVISION** |

     Argued January 17, 2018 — Decided August 9, 2018

     Before Judges Fuentes, Manahan and Suter.

     On appeal from Superior Court of New Jersey,
     Law Division, Hudson County, Docket No.
     L-3177-15.

     Vijayant Pawar argued the cause for
     appellant (Pawar Gilgallon & Rudy, LLC,
     attorneys; Vijayant Pawar, on the brief).

     Lawrence Bluestone argued the cause for
     respondents (Genova Burns, LLC, attorneys;
     Jennifer Borek, of counsel and on the brief;
     Michael C. McQueeny, on the brief).

     Adam M. Gordon argued the cause for amicus
     curiae Fair Share Housing Center (Fair Share
     Housing Center, attorneys; Kevin D. Walsh
     and Adam M. Gordon, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

In this appeal, this court must determine whether a municipality may condition the grant of tax abatements pursuant to the Long Term Tax Exemption Law (LTTEL), N.J.S.A. 40A:20-1 to -22, upon three urban renewal entities[1] making a prepayment of two million dollars, characterized as "a portion" of the Annual Service Charge the entities would pay in lieu of property taxes after the project was completed. The three urban renewal entities and the municipality agreed to this arrangement in Prepayment Agreements that were subsequently approved by the municipality's governing body in a resolution and expressly made part of the ordinance approving the tax abatements. These Prepayment Agreements predated the Financial Agreements that otherwise memorialized the terms of the tax abatements granted by the municipality.

We are also asked to determine the validity of a provision in the Financial Agreements that required the three urban renewal entities to pay a combined $710,769 initial contribution to the municipality's Affordable Housing Trust Fund (AHTF). However, unlike the two-million dollar prepayment required under the

_____

[1] See N.J.S.A. 40A:20-3(g) and N.J.S.A. 40A:20-5, which limit the operations of urban renewal entities and requires them to mitigate the harm caused to people displaced or affected by the project.

combined three Prepayment Agreements, the AHTF was part of the Financial Agreements and was based on a $1500 per unit basis for the two residential redevelopment projects that would construct a total of 1615 residential units, and a $1.50 per square foot basis for the commercial project, based on a gross, not leasable, square footage of 280,385. Furthermore, the total AHTF contribution made by each entity was subject to "contingencies" that were clearly described in the Financial Agreements and included a percentage payment schedule based on the completion of each individual project.

These issues arise in the context of a verified complaint filed in the Law Division by MEPT Journal Square Urban Renewal, LLC, MEPT Journal Square Tower North Urban Renewal, LLC, and MEPT Journal Square Tower South Urban Renewal, LLC (collectively "plaintiffs"), against the City of Jersey City (City), after these urban renewal entities decided not go forward with these redevelopment projects. Plaintiffs sought declaratory relief in the form of a judicial determination that the prepayment arrangement crafted by the parties in the Prepayment Agreements were ultra vires and void ab initio because they lacked statutory support under the LTTEL. Plaintiffs also sought injunctive relief in the form of a judgment from the Law Division compelling the City to refund the initial contributions made to the AHTF and a

refund of the two million dollar prepayment. The project was never built.

After joinder of issue, the Law Division granted plaintiffs' unopposed motion to proceed summarily, established an expedited briefing schedule, and set the matter down for oral argument and, if necessary, "limited testimony." On February 5, 2016, the trial court heard oral argument from counsel and reserved decision. In a letter-opinion dated August 16, 2016, the trial judge found the Prepayment Agreements to be "a run-around that essentially nullifies the requirement of the LTTEL, and . . . the financial agreement, that annual service charges shall not be due until substantial completion of the urban renewal project." The court declared the "prepayment agreements were void from their inception."

With respect to the contributions plaintiffs made to the City's AHTF, the trial court concluded the Fair Housing Act (FHA), N.J.S.A. 52:27D-301 to -329, did not provide the City with the legal authority to condition the grant of tax abatements upon a redeveloper contributing to its AHTF. Relying on the Supreme Court's analysis in Holmdel Builders Ass'n v. Holmdel, 121 N.J. 550 (1990), the court concluded that the "fairness and reasonableness of imposing an AHTF contribution fund payment on [p]laintiffs evaporated when the [p]laintiffs no longer possessed,

enjoyed, or consumed the land." The trial judge thus ordered the City to refund the AHTF contributions plaintiffs made in 2009 as a condition of obtaining the tax abatements pursuant to the LTTEL.

In a Final Order of Judgment dated October 4, 2016, the court granted judgment to plaintiffs and against the City in the amount of $2,710,769, based on the $2,000,000 prepayment and the $710,769 AHTF contribution. On November 9, 2016, the City filed a motion for reconsideration pursuant to Rule 4:49-2. Among the arguments raised therein, the City, for the first time, claimed the trial court erred in proceeding in a summary fashion and requested "the opportunity to exchange discovery." In an order dated January 12, 2017, the trial court denied the City's motion for reconsideration as both untimely and substantively without merit.

The City now appeals arguing the trial court erred when it interpreted the LTTEL to prohibit the prepayment plaintiffs made as a condition of obtaining the tax abatement. The City claims the Prepayment Agreements and the Financial Agreements requiring plaintiffs to contribute to the AHTF were valid, enforceable provisions negotiated by the parties under traditional principles of contract law. The City also argues the court erred when it failed to consider the arguments in its motion for reconsideration and in denying the City's request for discovery. For the first time on appeal, the City argues that plaintiffs' complaint should

have been dismissed as untimely under Rule 4:69-6(a). Finally, the City argues the court misconstrued the 2008 amendments to the FHA when it granted plaintiffs' application to refund the AHTF contribution.

As a threshold issue, plaintiffs argue the trial court correctly proceeded in a summary fashion because the issues raised in this case strictly involve matters of law. Plaintiffs further argue the trial court correctly concluded that the City did not have any authority under the LTTEL to condition the grant of a tax abatement upon the prepayment of Annual Service Charges. Thus, the court correctly declared the Prepayment Agreements were void ab initio. Plaintiffs also argue the court properly exercised its discretionary authority when it denied the City's motion for reconsideration. Plaintiffs also claim the City is procedurally barred from arguing, for the first time in its motion for reconsideration, that this cause of action is untimely under Rule 4:69-6(a). Plaintiffs argue that the rules that govern actions in lieu of prerogative writs do not apply to a complaint brought pursuant to the Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62, to determine the validity of a contract.

On August 29, 2017, after both sides had submitted their briefs in this appeal, this court entered a sua sponte order inviting the Fair Share Housing Center (Fair Share) to participate

in this appeal in an amicus curiae capacity, limited to the question of whether the City has an obligation to return to plaintiffs the $710,769 AHTF contribution.[2] Fair Share accepted this court's request, submitted a brief limited to this issue, and participated at oral argument. Fair Share urges this court to reverse the trial court's decision ordering the City to return the AHTF contributions received by plaintiffs as a condition of a tax abatement pursuant to the LTTEL. Fair Share argues the trial court erred in relying on the FHA and the Court's decision in Holmdel to evaluate the lawfulness of the AHTF contributions.

According to Fair Share, the Legislature decisively distinguished LTTEL trust fund contributions under N.J.S.A. 40A:12A-4.1, from a municipality's right to impose and collect development fees under N.J.S.A. 52:27D-329.2 of the FHA. Although both the parties and the trial court acknowledged the City's authority under LTTEL to impose AHTF contributions by ordinance and as a provision in the Financial Agreements, they incorrectly

_____

[2] Fair Share has served the judiciary in this capacity on numerous occasions. See Toll Bros. v. Twp. of W. Windsor, 173 N.J. 502 (2002); In re Declaratory Judgment Actions Filed by Various Municipalities, Cty. of Ocean, 446 N.J. Super. 259 (App. Div. 2016); Homes of Hope, Inc. v. Eastampton Twp. Land Use Planning Bd., 409 N.J. Super. 330 (App. Div. 2009); Oceanport Holding, L.L.C. v. Borough of Oceanport, 396 N.J. Super. 622 (App. Div. 2007).

conflated the inapplicable FHA requirements to invalidate the AHTF contributions under LTTEL. Stated differently, plaintiffs' $710,769 contribution to the City's AHTF as a condition of the tax abatement is expressly sanctioned by the Legislature under the LTTEL, N.J.S.A. 40A:12A-4.2.

After considering the arguments of the parties, we affirm the trial court's decision finding no statutory support under the LTTEL for the City to condition the grant of tax abatements to plaintiffs upon the prepayment of two million dollars, characterized as a credit against the Annual Service Charge the entities would pay after the project was completed. These Prepayment Agreements are ultra vires under the LTTEL, and unenforceable as a matter of public policy.

We reach a different conclusion with respect to the City's decision to condition the grant of these tax abatements upon plaintiffs contributing to the municipality's AHTF. We agree with the legal arguments advanced by amicus Fair Share that these contributions are expressly authorized by the Legislature under the LTTEL in N.J.S.A. 40A:12A—4.2, and are independent from and unrelated to the FHA. We thus reverse the order of the trial court requiring the City to refund the $710,769 contribution plaintiffs made to the City's AHTF as a condition for receiving the tax abatements. The provisions in the Financial Agreements

requiring the payment of these AHTF contributions and the municipal ordinance subsequently adopted by the City Council confirming these AHTF contributions as a material condition of the tax abatements are statutorily supported in the LTTEL.

We recite the following facts from the record presented to the Law Division.

I

A

Financial Agreements

On May 15, 2009, plaintiffs and the City entered into three separate Financial Agreements that contained the terms and conditions of the long term tax abatements granted to plaintiffs pursuant to the LTTEL. The City granted a tax abatement for three separate projects, which were authorized by the City Council through three separate ordinances. Each ordinance was supplemented by the Financial Agreements.

Ordinance 08-165, recognized MEPT Journal Square Tower North Urban Renewal, LLC (Tower North), as the urban renewal entity "formed and qualified to do business" under the provisions of the LTTEL, and "the owner of Unit 2," one of three units described as the Tower North of Residential Rental Building, a property located within the boundaries of the Journal Square Redevelopment Plan. One of the Recitals of the Financial Agreement corresponding to

Ordinance 08-165 disclosed that Tower North planned to construct approximately 922 residential rental units in a tower approximately sixty-eight stories tall.

Ordinance 08-166 recognized MEPT Journal Square Tower South Urban Renewal, LLC (Tower South) as an urban renewal entity and "owner of Unit three," a property located within the boundaries of the Journal Square Redevelopment Plan.  The Recitals of the Financial Agreement disclosed that Tower South planned to construct approximately 693 residential rental units in a tower approximately fifty stories tall.

Ordinance 08-164 recognized MEPT Journal Square Urban Renewal, LLC (MEPT Journal Square) as an urban renewal entity and owner of the Commercial Unit, a property located within the boundaries of the Journal Square Redevelopment Plan.  The Recitals of the Financial Agreement disclosed that the Commercial Unit would have an approximately 210,000 square-foot area, consisting of 700 parking spaces, and 70,585 square feet of retail space, for a total of 280,385 gross square feet in a seven story building.

The Financial Agreements provided that these three projects "shall be construed and enforced in accordance with the laws of the State of New Jersey . . . [and] in the event of a conflict between [the financial agreements] and the [LTTEL], the [LTTEL] shall govern . . . ."  They were to "remain in effect for the

earlier of 35 years from the date of the adoption of [their instituting ordinances] . . . or 30 years from the date of Substantial Completion of the Project."

Article IV of the Financial Agreement for Tower North, titled "ANNUAL SERVICE CHARGE" described the payments plaintiffs agreed to pay "in consideration of the tax exemption."[3] Plaintiffs agreed to pay an annual service charge in "an amount equal to the greater of: the Minimum Annual Service Charge or an Annual Service Charge equal to ten percent [] of the Annual Gross Revenue." The "greater of the Annual Service Charge or Minimum Annual Service Charge . . . shall be due on the first day of the month following the Substantial Completion of the Project."

The Financial Agreements defined "Annual Service Charge" as "the amount the Entity has agreed to pay the City for municipal services supplied to the Project, which sum is in lieu of any taxes . . . ." "Minimum Annual Service Charges" are "the taxes levied against the real property in the area covered by the Project in the last full tax year in which the area was subject to taxation, which [for Tower North] the parties agree is $173,223." The minimum annual service charge for Tower South was $121,256, and

---

[3]   The other two Financial Agreements for Tower South and the Commercial Unit contained identical language, differing only in the amount the particular urban renewal entity agreed to pay.

$51,967 for the Commercial Unit. The minimum annual service charges plaintiffs agreed to pay totaled $346,446.00. The minimum annual service charges served as the floor for the amount of the Annual Service Charge to be paid. Plaintiffs were also required to pay a County Annual Service Charge and an Administrative Fee.

**B**

**AHTF Contributions**

All three Financial Agreements also contained the following provision in Article IV, Section 4.6, titled "Affordable Housing Contribution and Remedies":

> A. <u>Contribution</u>. The Entity shall pay the City . . . as a contribution subject to the contingencies set forth below. The sum shall be due and payable as follows:
>
>> i. 25% on or before the execution of the exemption Financial Agreement, but not later than 60 days after the adoption of the Ordinance approving this tax exemption;
>>
>> ii. 25% on or before the Substantial Completion of the project approved for [the urban renewal entity];
>>
>> iii. 25% on or before the Substantial Completion of this Project; and

iv. 25% on or before the Substantial Completion of the project approved for [the urban renewal entity].[4]

The Entity acknowledges that the City relies on these payments and will enter into agreements in anticipation of receiving such funds in a timely manner.

B. Remedies. In the event that the Entity fails to timely pay the contributions, the amount unpaid shall be added to the service charge and shall bear the highest rate of interest permitted in the case of unpaid taxes or tax liens on the land until paid.

Section 4.7, titled Material Conditions, characterized a series of payments and service charges the entity agreed to pay as "Material Conditions of this Agreement." AHTF contributions were included in this list of "Material Conditions." The AHTF contribution assessed to Tower North was based on $1500 x 922 units, totaling $1,383,000; Tower South was based on $1500 x 693 units, totaling $1,039,500; and the Commercial Unit was based on $1.50 per square foot "based upon gross, not leaseable, [sic] square footage of 280,385," totaling $420,578. The three ordinances adopted by the City Council approving the tax abatements

_____

[4] The event that triggered plaintiffs' obligation to pay the third 25% installment of its total AFTF contribution varied. In the Tower North and the Commercial Unit Financial Agreements, the third 25% of the total AHTF contribution was due on or before the Substantial Completion of Tower South. In the Tower South Financial Agreement, the third 25% of the total AHTF contribution was due on or before the Substantial Completion of Tower North.

also included, as a condition, the AHTF contributions based on the calculation methodology reflected in Article IV, Section 4.6 of the Financial Agreements.

On June 5, 2009, plaintiffs' counsel wrote a letter to the City Administrator memorializing the release of $2,710,769, "representing the Two Million ($2,000,000) Dollar prepayment amount in the aggregate for all the [F]inancial Agreements relating to the tax abatement and the twenty-five percent (25%) first-installment of the Affordable Housing Contribution Payment in the amount of Seven Hundred Ten Thousand Seven Hundred Sixty-Nine ($710,769) Dollars, which amounts were paid under the Tax Abatement Documents . . . ."  Plaintiffs' counsel had held these funds in escrow "until such time as that certain ordinance of the County of Hudson is passed and deemed final . . . ."  Counsel acknowledged that "[a]s of June 3, 2009, the County Ordinance was passed and adopted without challenge."

<u>C</u>

<u>Prepayment Agreements</u>

On May 11, 2009, plaintiffs and defendant entered into three separate Prepayment Agreements, one for each of the three urban renewal entities.  The three ordinances adopted by the City Council approving the tax abatements contained the following clause acknowledging the material nature of these Prepayment Agreements:

A-2281-16T4

"This Ordinance <u>shall be contingent upon the execution by the</u> <u>Entity of the Prepayment and Contribution Agreements for each of</u> <u>the three (3) condominiums forming the Journal Square</u> <u>Development</u>." (Emphasis added).

The Prepayment Agreements began with the following recitals:

> WHEREAS, Entity has been authorized by the City to construct a project . . . under the Law with attendant tax exemption benefits as provided in the Law and pursuant to a certain Financial Agreement . . .; and
>
> WHEREAS, Entity recognizes that the Annual Services Charges payable under the Law with respect to its Project will not begin to accrue to the City until the Project is completed; and
>
> WHEREAS, the City is in immediate need of additional funds for use during this fiscal year; and
>
> WHEREAS, Entity is willing to prepay the Annual Service Charges in the amounts as set forth herein that will accrue from the Project in exchange for the City's agreement to credit such payments through credits against future Annual Service Charges that will become due; and
>
> WHEREAS, by the adoption of Resolution . . . on November 25, 2008, in order to allow the City to anticipate and rely on the funds and properly account for the funds, the City of Jersey City approve[d ]the prepayment of Annual Service Charge and authorize[d] the execution of an agreement . . . .

Under these agreements, the urban renewal entities were required to prepay Annual Service Charges that would not accrue

until the completion of their particular project. The prepayment would only be credited against future annual service charges to be collected over the first four years following the substantial completion of the project. The entities acknowledged that the City was relying on this prepayment and "will enter into agreements in anticipation of receiving such funds in a timely manner." Thus, "[a]ny late payment of the Prepayment . . . shall bear interest at the rate of 6% until paid." Conversely, because the entities were not obligated under the LTTEL to enter into these Prepayment Agreements, the prepayments were in essence an interest-free loan to the City.

However, as the following provisions in the Prepayment Agreements show, the City viewed this arrangement differently:

> B. Credit. [The] City agrees to give Entity a credit, without interest, against the Annual Service Charges otherwise due under the Financial Agreement in the following manner:
>
> > (i) For each of the first four (4) years that the Entity is obligated under the Financial Agreement to pay Annual Service Charges, the Entity shall be entitled to a credit against such charges estimated as follows [for Tower South]: $175,000 in 2010; $175,000 in 2011; $175,000 in 2012; and $175,000 in 2013, with the credit prorated for the first

16

year and last year if such years are less than full calendar years;[5]

(ii) The Annual Service Charges are to be paid quarterly under the Financial Agreement. The credits hereunder are to be taken against the earliest quarterly payments in each year until the annual amount of the credit, or appropriate pro rata portion for less than a full year, has been recouped in full by the Entity;

. . . .

(iv) Notwithstanding, under no circumstances shall the Entity be entitled to a credit in excess of the amount of the actual Annual Service Charges (that is, excluding any credit for the land taxes) actually paid by the Entity.

C. No Additional Credit. In the event the Entity is unable to recover its Prepayment as a credit against the Annual Service Charge, in whole or in part, for any reason, then any Prepayment balance otherwise due, shall be forfeited.

D. Coordination of Credit. The Office of Tax Abatement of the City shall notify the appropriate taxing authorities of this credit arrangement so that the bills for Annual Service Charges when issued will reflect the credit.

Section 3. Payments. All payments due hereunder shall be sent to the Director of the

---

[5] North Tower was entitled to the following credits against the annual service charge: $250,000 in 2010; $250,000 in 2011; $250,000 in 2012; and $250,000 in 2013. The Commercial Unit was entitled to the following credits against the annual service charge: $75,000 in 2010; $75,000 in 2011; $75,000 in 2012; and $75,000 in 2013.

A-2281-16T4

Office of Tax Abatement, with a copy to the
Business Administrator.

The three urban renewal entities involved here made three prepayments totaling $2,000,000; Tower North paid $1,000,000; Tower South paid $700,000; and Commercial Unit paid $300,000.

D

Termination of the Project and Sale of the Property

In the brief filed in this appeal, plaintiffs claim they originally intended to go forward with the three projects described in the Financial Agreements. However, they "refrained from building the Project for more than five years." No further information is included in the appellate record that explains or provides any reasons for plaintiffs' decision in this respect.

On December 29, 2014, plaintiffs conveyed all of the undeveloped properties to One Journal Square Partners Urban Renewal Company, LLC, One Journal Square Tower South Urban Renewal Company, LLC, and One Journal Square Tower North Urban Renewal Company, LLC (collectively "One Journal Square"), a redeveloper unrelated to the original project. In plaintiffs' verified complaint, Robert B. Edwards, the President of MEPT Journal Square avers:

> One Journal Square did not take assignment of
> and did not become a successor entity under
> the terms of the Financial Agreements and/or
> the Prepayment Agreements.

18

> Thus, the Financial Agreements and the Prepayment Agreements are no longer in effect and [p]laintiffs will never receive any of the benefits contemplated under those Agreements.
>
> . . . [O]n or about April 2, 2015, [p]laintiffs sought a repayment of the Prepayment from the City, by virtue of the fact that no Annual Service Charges had accrued, and <u>the City's only purported claim to the Prepayment was an upfront loan required of [p]laintiffs in order to receive the tax abatement</u>.
>
> [(Emphasis added).]

The appellate record includes a copy of an email from plaintiffs' counsel to an unidentified person that appears to have some connection with the City. This individual invoked a provision in the Prepayment Agreements that stated: "In the event the Entity is unable to recover its Prepayment as a credit against the Annual Service Charge, in whole or in part, for any reason, then any Prepayment balance otherwise due, shall be forfeited."

## II

### Prepayment Agreements with the City

The Law Division decided this matter strictly on its interpretation of the LTTEL and the FHA. We review questions related to statutory interpretation de novo, without affording any deference to the trial court. <u>State v. Revie</u>, 220 N.J. 126, 132 (2014). In construing a statute, our role "'is to determine and effectuate the Legislature's intent.'" <u>State v. Friedman</u>, 209 N.J.

19

102, 117 (2012) (quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009)). "'[T]he starting point of all statutory interpretation must be the language used in the enactment.' We construe the words of a statute 'in context with related provisions so as to give sense to the legislation as a whole.'" Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018) (first quoting DCPP v. Y.N., 220 N.J. 165, 178 (2014); then quoting N. Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541, 570 (2017)).

Guided by these well-settled principles, we start our analysis by recognizing that in enacting the LTTEL, the Legislature intended to eliminate unnecessary, redundant laws that impeded the elimination of blighted areas and at the same time promote laws that "encourage[d] private capital and participation by private enterprise" to contribute in the restoration of deteriorated or neglected properties. N.J.S.A. 40A:20-2. In furtherance of this public policy, the Legislature authorized municipalities "to contribute toward this purpose through the use of special financial arrangements, including the granting of property tax exemptions with respect to land and the buildings . . . ." Ibid. The Legislature declared "that the provisions of [LTTEL] are one means of accomplishing the redevelopment and rehabilitation purposes of the 'Local Redevelopment and Housing Law,' [N.J.S.A. 40A:12A-1 to

-49] . . . and that this act should be construed in conjunction with that act."  Ibid.

In enacting the LTTEL, the Legislature carefully crafted a statutory scheme that provides municipalities with the means to carry out the public policy underpinning the act.  One of the key issues concern the parameters of the financial agreements that set the terms between the City and the urban renewal entities. Pursuant to N.J.S.A. 40A:20-4, "[t]he governing body of a municipality which has adopted a redevelopment plan pursuant to the 'Local Redevelopment and Housing Law,' . . . may enter into a financial agreement with an urban renewal entity . . . ."  However, the form and content of the "financial agreement shall include, but not be limited to, those provisions set forth in [other sections of the LTTEL].  Ibid.  For example, N.J.S.A. 40A:20-8 delineates the contents of application forms, the process for review by the "mayor or other chief executive officer," and the final approval by the municipal governing body.

N.J.S.A. 40A:20-9 sets forth the statutory requirements of the "financial agreement," an issue of particular relevance here. The statute requires:

> Every approved project shall be evidenced by
> a financial agreement between the municipality
> and the urban renewal entity.  The agreement
> shall be prepared by the entity and submitted
> as a separate part of its application for

21

project approval. The agreement shall not take effect until approved by ordinance of the municipality. Any amendments or modifications of the agreement made thereafter shall be by mutual consent of the municipality and the urban renewal entity, and shall be subject to approval by ordinance of the municipal governing body upon recommendation of the mayor or other chief executive officer of the municipality prior to taking effect.

N.J.S.A. 40A:20-9 further requires that the financial agreement be fully performed "within 30 years from the date of completion of the project . . . ."

"Where the statute sets forth the procedure to be followed, no governing body, or subdivision thereof, has the power to adopt any other method of procedure." Midtown Props., Inc. v. Twp. of Madison, 68 N.J. Super. 197, 207 (Law Div. 1961), aff'd o.b., 78 N.J. Super. 471 (App. Div. 1963)). Here, N.J.S.A. 40A:20-9 requires that financial agreements include the following specific provisions:

> a. That the profits of or dividends payable by the urban renewal entity shall be limited according to terms appropriate for the type of entity in conformance with the provisions of [the LTTEL].
>
> b. That all improvements and land, to the extent authorized pursuant to [N.J.S.A. 40A:20-12], in the project to be constructed or acquired by the urban renewal entity shall be exempt from taxation as provided in [the LTTEL].

22

c. That the urban renewal entity shall make payments for municipal services as provided in [the LTTEL].

d. That the urban renewal entity shall submit annually, within 90 days after the close of its fiscal year, its auditor's reports to the mayor and governing body of the municipality.

e. That the urban renewal entity shall, upon request, permit inspection of property, equipment, buildings and other facilities of the entity, and also permit examination and audit of its books, contracts, records, documents and papers by authorized representatives of the municipality or the State.

f. That in the event of any dispute between the parties matters in controversy shall be resolved by arbitration in the manner provided in the financial agreement.

g. That operation under the financial agreement shall be terminable by the urban renewal entity in the manner provided by [the LTTEL].

h. That the urban renewal entity shall at all times prior to the expiration or other termination of the financial agreement remain bound by the provisions of [the LTTEL].

Conspicuously missing from this detailed recitation is any direct reference or even oblique allusion to any authority that would permit a municipality to enter into a separate agreement in which a municipality may condition the grant of a tax abatement upon the urban renewal entity agreeing to prepay "a portion" of its Annual Service Charge. Stated differently, where specific

23

procedures are provided by the Legislature, a municipality may not rely upon or resort to its claimed police powers. See Dome Realty, Inc. v. City of Paterson, 83 N.J. 212, 232-33 (1980).

The City argues we should review the enforceability of the Prepayment Agreements under traditional principles of contract law. This argument is irreconcilable with one of our State's governing principles that "a municipality is a creature of the Legislature, and as such is a government of enumerated powers which can act only by delegated authority." Inganamort v. Ft. Lee, 72 N.J. 412, 417 (1977). Thus, "while a public body may make contracts as an individual, it can only do so within its express or implied powers . . . ." Kress v. La Villa, 335 N.J. Super. 400, 410 (App. Div. 2000) (quoting Midtown Props., Inc., 68 N.J. Super. at 208). The City's authority to grant tax abatements is exclusively derived from the LTTEL. The Legislature delegated this authority to the City as a means of revitalizing blighted areas by encouraging the participation of private enterprise to restore deteriorated or neglected properties. N.J.S.A. 40A:20-2.

Moreover, in our view, the Prepayment Agreements the City and plaintiffs entered into have all the trappings of an iniquitous, mutually beneficial gratuity. It allowed the redevelopers to secure the tax abatement they sought, and granted the City immediate access to two million dollars to balm the revenue

24

shortfall it was experiencing at the time, without raising property taxes or reducing municipal services. The recitals of the Prepayment Agreements unequivocally reveal the meretricious quid pro quo of the Prepayment Agreements:

> WHEREAS, Entity recognizes that the Annual Services Charges payable under the Law with respect to its Project will not begin to accrue to the City until the Project is completed; and
>
> WHEREAS, the City is in immediate need of additional funds for use during this fiscal year; and
>
> WHEREAS, Entity is willing to prepay the Annual Service Charges in the amounts as set forth herein that will accrue from the Project in exchange for the City's agreement to credit such payments through credits against future Annual Service Charges that will become due; and
>
> WHEREAS, by the adoption of Resolution . . . on November 25, 2008, in order to allow the City to anticipate and rely on the funds and properly account for the funds, the City of Jersey City approved the prepayment of Annual Service Charge and authorize the execution of an agreement . . . .
>
> [(Emphasis added).]

We confidently conclude that this arrangement concocted by the City to alleviate an immediate revenue shortfall was not envisioned, or even remotely contemplated, by the Legislature when it adopted the LTTEL.

Contributions to the Affordable Housing Trust Fund

When it adopted the LTTEL, the Legislature declared "that the provisions of [LTTEL] are one means of accomplishing the redevelopment and rehabilitation purposes of the 'Local Redevelopment and Housing Law', . . . and that this act should be construed in conjunction with that act." N.J.S.A. 40A:20-2 (emphasis added). The Legislature amended the Local Redevelopment and Housing Law in 2003 as follows:

> Any municipality that has designated a redevelopment area, provides for a tax abatement within that redevelopment area and has adopted a housing element . . . may, by ordinance, require, as a condition for granting a tax abatement, that the developer set aside affordable residential units or contribute to an affordable housing trust fund established by the municipality. The requirement may be imposed upon developers of market rate residential or non-residential construction or both, at the discretion of the municipality.
>
> [N.J.S.A. 40A:12A-4.1 (emphasis added).]

Thus, in sharp contrast to the Prepayment Agreements we have invalidated here, the Legislature expressly authorized municipalities to adopt an ordinance to require an urban renewal entity to contribute to a municipal affordable housing trust fund as a condition of receiving a tax exemption under the LTTEL. Furthermore, as N.J.S.A. 40A:12A-4.1 makes clear, the municipality

may impose this requirement "upon developers of market rate residential or non-residential construction or both, at the discretion of the municipality."

The Legislature also codified the methods for calculating AHTF contributions:

> Any municipality that makes the receipt of a tax abatement conditional upon the contribution to an affordable housing trust fund shall include within the ordinance detailed guidelines establishing the parameters of this requirement including, but not limited to, the following:
>
> > a. standards governing the extent of the contribution based on the value of construction for market rate residential or non-residential construction, as the case may be; provided, however, that this contribution shall not exceed $1,500 per unit for market rate residential construction, $1.50 per square foot for commercial construction, and 10 cents per square foot for industrial construction;
> >
> > b. a schedule of payments based upon phase of construction; and
> >
> > c. parameters governing the expenditure of those funds, legitimate purposes for which those funds may be used, and the extent to which funds may be used by the municipality for administration.
>
> [N.J.S.A. 40A:12A-4.2.]

Here, the City adopted three separate ordinances that incorporated the "Affordable Housing Contribution" provisions described in Article IV, Section 4.6 of all three Financial Agreements. As we explained in detail in Subsection I-B, the City ordinances imposed AHTF contributions upon Towers North and South, the two urban renewal entities that were constructing residential projects, based on $1500 per unit. The AHTF contribution that the City imposed on the urban renewal entity that was constructing the Commercial Unit was based on a $1.50 per square foot of "gross, not leaseable" space. The ordinances further established a twenty-five percent installment plan for the payment of the AHTF contributions. The $710,769 at issue in this case represents the first twenty-five percent installment payment due under this plan. We hold the methods the City employed were consistent with the statutory guidelines established in N.J.S.A. 40A:12A-4.2.

The trial court's decision invalidating these AHTF contributions erroneously applied the provisions in the FHA and the Supreme Court's analysis in Holmdel. We hold the City was entitled to condition the grant of tax abatements upon a redeveloper's contributions to the municipal AHTF pursuant to N.J.S.A. 40A:12A-4.1. Finally, we affirm the Law Division's order denying the City's motion for reconsideration as untimely under Rule 4:49-2, for the reasons expressed by this court in Hayes v.

Turnersville Chrysler Jeep, 453 N.J. Super. 309, 312-313 (App. Div. 2018).

IV

Summary

We affirm the Law Division's judgment invalidating the Prepayment Agreements entered into by the parties on May 15, 2009, as ultra vires and unenforceable, and requiring the City to refund plaintiffs the two million dollars plaintiffs paid thereunder. We reverse the court's decision invalidating the $710,769 contribution plaintiffs made to the City's AHTF pursuant to N.J.S.A. 40A:12A-4.1 of the Local Redevelopment and Housing Law, as applied in this case through the LTTEL. The remaining arguments raised by the City in this appeal lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2281-16T4