# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 19-816


**HERMAN LEE HOOPER**

**VERSUS**

**LOUISIANA PIGMENT COMPANY, LP**


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2013-1665
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Candyce G. Perret, Judges.


**AFFIRMED.**

**Rudie R. Soileau, Jr.**
**Jackey White South**
**T. Houston Middleton, IV**
**Lundy, Lundy, Soileau & South, LLP**
**501 Broad Street**
**Lake Charles, LA 70601**
**(337) 439-0707**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Louisiana Pigment Company, LP**

**Somer G. Brown**
**Richard E. Wilson**
**Cox, Cox, Filo, Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Herman Lee Hooper**

**GREMILLION, Judge.**

The defendant-appellant, Louisiana Pigment Company, LP (Louisiana Pigment), appeals the jury's finding of wrongful termination in favor of its former employee, the plaintiff-appellee, Herman Lee Hooper. For the following reasons, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In April 2013, Hooper filed a petition for damages for unlawful termination by Louisiana Pigment. Hooper alleged that following a knee replacement on November 30, 2011, unrelated to his employment, his employer unlawfully terminated him after it re-worked his job description from a managerial position to a shift supervisor requiring manual labor and required him to undergo a functional capacity evaluation (FCE) despite his physician's release for work effective May 2, 2012. Hooper alleged violations of La.R.S. 23:323(A) and (B) (1), (2), (3), (5) and (7).

In August 2016, Hooper filed a motion in limine and request for expedited hearing, urging that any evidence relating to the receipt of disability benefits be deemed inadmissible. Hooper further alleged that any benefits he received constituted a collateral source. Attached to the motion were two different job descriptions for Hooper's position, "Production Maintenance Coordinator," evidencing extremely different levels of required manual labor. Louisiana Pigment opposed the motion and ultimately filed a supervisory writ with this court in October 2016, following the trial court's grant of Hooper's motion, which ruled that "[t]here shall be no mention in argument or voir dire, nor any evidence offered, whether testimonial, documentary, or otherwise, relating to Plaintiff's application for, determination by, or receipt of any disability payments from either private long-term disability or the Social Security Administration." We denied the writ.[1] Writs were taken to the supreme court. The

---

[1] Two members of the five-judge panel would have granted the writ and found that the trial court abused its discretion in granting Hooper's motion in limine and would have allowed evidence of his applications for disability benefits.

Louisiana Supreme Court granted the writ in part and stated, "The judgment of the trial court granting the motion in limine is reversed insofar as it excludes evidence of the plaintiff's applications for disability benefits."

In July 2017, Hooper filed a *Daubert* motion to exclude the witness testimony of Joel Friedman, a lawyer who was set to testify as an expert in the area of disability, discrimination, and employment law. In September 2017, Louisiana Pigment filed a *Daubert* motion to exclude the testimony of Jeffery Stevens, who would be called as an expert in human resources. The trial court rendered a judgment denying Louisiana Pigment's motion to exclude the testimony of Stevens and deferred Hooper's motion to exclude the testimony of Friedman to the merits. Louisiana Pigment, thereafter, filed a motion in limine to limit or exclude future earnings-loss testimony.

In April 2018, Hooper filed a motion for partial summary judgment asserting that there were no genuine issues of material fact on the issues of Louisiana Pigment's violation of La.R.S. 23:323(B). In July 2018, the trial court denied Hooper's motion for partial summary judgment, stating:

> There are conflicting records as to Plaintiff's actual complaints. This taken in conjuncture with the Doctor's prognosis create a genuine issue of material fact regarding whether Mr. Hooper was an "otherwise qualified person" as defined by La.R.S. 23:323(B)(5).
>
> Mr. Hooper's credibility in explaining these conflicts will need to go to the weight of the evidence and be determined by the trier of fact.

The matter proceeded to a jury trial. After six days of testimony and evidence, the jury returned a verdict in favor of Hooper in the amount of $1,754,130.00 plus legal interest and court costs. The jury found by a preponderance of the evidence that Hooper had a disability; that he was an otherwise qualified person with a disability; that he was terminated based on a physical examination that was not directly related to the requirements of his specific job or was not required of all employees who are similarly

2

situated; and that the physical examination given to Hooper was not job-related or consistent with Louisiana Pigment's business necessity and that his job performance could be accomplished by reasonable accommodation.

The trial court awarded Hooper attorney fees in the amount of $581,682.66 and taxed Louisiana Pigment $14,507.16 in additional court costs. In May 2019, Louisiana Pigment filed a motion for new trial, judgment notwithstanding the verdict, or remittitur, which was denied by the trial court. Louisiana Pigment now appeals and assigns as error:

> 1. The trial court erred when it allowed the admission of evidence of subsequent employee exams through a new medical provider engaged by Louisiana Pigment subsequent and without relationship to the employment of Herman Lee Hooper thereby allowing an improper and irrelevant argument to support a violation of [La.R.S.] 23:323.B(5).

> 2. The jury's general damage award of $701,652 for mental anguish is excessive and not supported by the evidence.

> 3. The trial court erred when it excluded evidence of disability benefits received by Herman Lee Hooper, benefit payments relevant to defend the general damage claim asserted by Herman Lee Hooper.

> 4. The trial court erred in disallowing a credit for disability payments funded and paid by Louisiana Pigment, payments that do not fall within the definition of the collateral source rule.

> 5. The trial court abused its considerable discretion and thus erred in its award of fees and costs.

> 6. The trial court erred in declining to grant a new trial, judgment notwithstanding the verdict or, alternatively, reducing the award.

### EVIDENCE

The jury was presented with extensive testimonial and documentary evidence.

Quentin Busby, the human resources supervisor for Louisiana Pigment, testified that he had worked there since 1991. He reviewed a number of Hooper's employment records. He testified that Hooper became a maintenance supervisor in 2006. In 2008, HR records indicate that Hooper had a knee surgery in February and was released to

work on March 6, 2008, with the restriction of "no kneeling on knees," with the duration set at "undetermined." Hooper was not required to undergo an FCE.

Busby testified that in 2011, Hooper scheduled double knee replacements and also had to have an emergency shoulder surgery. After the shoulder surgery in Spring 2011, Hooper was released to return to work on May 27, 2011, with the restriction of no climbing, no lifting, pushing or pulling greater than fifteen pounds. In an email dated May 26, 2011, Hooper's boss, Kevin Ledoux, notified various other employees:

> Lee is scheduled to see his doctor on the evening of May 26th and be released to return to work. His shoulder will not be totally recovered and he will be going through physical therapy, but I told him that he should be able to perform his normal duties. I told Lee to go to BHP [Business Health Partners] on Friday morning, May 27th, unless he hears from Sharon. Lee has vacation scheduled for June 20-July 11. Lee has left knee scheduled for August 15, with a 6-8 week recovery period. Then he has right knee surgery scheduled for October 17 with a 6-8 week recovery. I asked if [he] could schedule the knee surgeries together and he thought he would be too handicapped.

Busby then reviewed a "Job Analysis" of production maintenance supervisor that was created by Ledoux on May 24, 2011, following the shoulder surgery in preparation for Hooper's return to work. The one-page document lists the following physical requirements of the job: Standing for a half an hour at a time for a total of one hour per day; walking for two hours at a time for a total of two hours per day; and sitting three hours at a time up to five hours per day. It listed "equipment climbed on" as "10% stairs, 5% ladder, and 1% scaffold."

Following the first knee surgery, Hooper was released to return to "light duty" work by Dr. Nathan Cohen on October 6, 2011. He was not required to undergo an FCE. Following the second knee surgery, Hooper was released by Dr. Cohen to return to work on March 19, 2012, with the restriction: "[Patient] may return to work light duty-desk work only allowing him to get up every 30 minutes to walk for 3 minutes."

Busby was then shown an email from Ledoux dated April 4, 2012, that stated:

4

Just got a call from Lee. At Lee's appointment today, his doctor gave him a return to work release for May 2. He does not have to see him again. The doctor told Lee that his existing pain is from scar tissue and will get better with time. Lee is no longer having to go to physical therapy but he is going to the gym on his own. I told him that I would relay the message to Sharon when she returns.[2]

Dr. Cohen issued another release for return to full work duty on May 2, 2012. There was no mention of an FCE being required. Busby testified that employees who are out for medical reasons are required to check in with Business Health Partners (BHP) weekly if they are able to and to see the company doctor every other week, who comes every Thursday to the plant. On April 12, 2012, Hooper met with Jackie Guidry, a nurse from BHP, at the plant. Guidry's notes from that date reveal: "States decreased pain when walking and is currently working on stair climbing. Patient is released to full duty on 5-2-2012 by MD." Again, there was no mention of an FCE being required.

The next document addressed by Busby is the "physical position description" created by Paul Fontana for production supervisors at Louisiana Pigment.[3] This document is dated April 23, 2012, and comprises twelve pages. Busby testified that there had never been an FCE for a supervisor prior to Hooper. He said he was responsible for coordinating with Fontana so that he could meet various employees to find out what duties the production supervisor position entailed. Busby testified that during Hooper's absence, the job of production supervisor had not changed, they just did not have a job description.

Busby next reviewed Nurse Guidry's remarks following a visit with Hooper on April 26, 2012, which states: "Incision has healed. States no longer taking narcotics. States pain only increases after standing for more than eight hours. Pain level is usually

---

[2] Sharon Groves is the nurse that works for Louisiana Pigment's medical provider, Business Health Partners (BHP).

[3] Paul Fontana owns the Center for Work Rehabilitation, Inc., which has locations in Lafayette, Louisiana and Houston, Texas.

one of ten standing, and two of ten going from sitting to standing. MD released for 5-2-12, pending FCE." Busby agreed that this was the first time an FCE had been mentioned. He testified that he was unaware of what the FCE would consist of. Busby was then presented with an April 26, 2012 medical release created by Nurse Guidry indicating that Hooper could return to work on May 2, 2012, pending completion of an FCE. The twelve-page FCE was then offered into evidence. Busby testified that, to his knowledge, Hooper was the only production supervisor to ever take an FCE. Busby then testified that Louisiana Pigment subsequently employed a different company to administer FCE evaluations, and the subsequent testing was only a day long, as opposed to three days, and consisted of skills listed on one piece of paper as opposed to the twelve pages of skills created by Fontana.

Busby testified regarding the FCE that was administered to Hooper. Hooper completed the daily, eight-hour-long testing for the first two days on May 7 and May 8, 2012, but upon arriving for the third day, Fontana declined to finish the test. Hooper then left Fontana's office and immediately went to Dr. Cohen's office to get a release in order to finish the test. On May 9, 2012, Dr. Cohen issued another full-duty work release effective May 10, 2012. Also, on May 9, 2012, Pam Davis, the Benefits Administrator of Louisiana Pigment, sent Hooper a letter stating in part:

> You have been on short term disability since November 30, 2011. Your short term disability will end on May 27, 2012. (This also means your employment will end). In order for your long term disability claim to be reviewed, Sun Life Assurance Company of Canada requires that the enclosed documents be completed.

On May 13, 2012, Fontana sent Busby an email stating in part:

> After thinking about Mr. Hooper, if the doctor and PT say there is nothing further they can do for him and that the pain he is feeling is not an indication that something is wrong that make his knees worse, then if you are looking to help him get back to work with ya'll [sic] the thing I would recommend is work hardening.

On May 31, 2012, Busby received an email from Fontana's business place indicating that the FCE was discontinued on the third day due to Hooper's reports of increased pain in both knees with standing activities. Busby testified that he spoke with Fontana, and Fontana would not let Hooper finish and/or repeat the FCE without first attempting work hardening. He said that Louisiana Pigment did not volunteer to pay for the work hardening. Busby testified that Hooper was not allowed to return to the plant and do his job because the FCE was not completed.

On cross-examination, Busby testified that he spoke with Hooper after the first two days of the FCE and pleaded with him to finish the test so that he could return to work. However, Busby said that Fontana would not allow him to return to take the test without the work hardening and that Hooper said he could not do it because it caused him too much pain. As to why the FCE came about this time, but not any for any of Hooper's other surgeries, Busby testified:

> The reasoning is because the complaints of pain. And because the second knee surgery took so long as compared to the other procedures and the other return to works. The complaints of pain and the medications that he was taking, that was the reason for the FCE, the concerns that brought up an FCE in the first place.

Busby went on to state that Louisiana Pigment did not order the FCE, but that BHP did. Busby said no one can return to work without medical approval from BHP. As to the job description Fontana created for Hooper's position, Busby said that they simply did not have one prior to this because they create them on an as-needed basis. Busby testified it was never his goal to create an obstacle for Hooper to return to work, and in fact, it was just the opposite. He said that no one at Louisiana Pigment had any control over the testing conducted by Fontana, an independent vendor. Busby testified that Louisiana Pigment switched to a local company owned by Scott Lounsberry to conduct FCEs sometime in early 2013.

7

Paul Fontana, an expert in the field of occupational therapy, with particular expertise in the area of industrial occupational therapy, testified that he had worked with industrial customers for the past forty-three years. He testified that he develops a quantifiable physical job description and then uses it to develop protocols for return-to-work FCEs. He also administers the FCEs. In 2012, Fontana testified that he developed the fit-for-duty programs for about fifty different companies and performed 250 to 300 FCEs per year.

Fontana testified that Hooper successfully completed the first two days of the FCE, which involved extremely strenuous activity such as climbing over twenty flights of stairs and a twelve-foot ladder multiple times. Fontana testified, contrary to Busby, that if Busby had called him and instructed him to let Hooper finish the test, he would have complied. Fontana was questioned if it would have served any purpose to have Hooper drive back to Lafayette for the third day of testing and he said:

> If we were still looking at can he be [a] production supervisor, the answer to that would be, no. He hasn't done anything to make himself better. There's no reason to do that.
>
> If the question was, look, we've got a very light-duty job or whatever, and we just want to see. Then, yes, there could have been some rational of me seeing him again, quickly.

Fontana testified that he has full control over deciding what will be encompassed in the FCE; the client has no input in what he/she wants out of an evaluation. He ultimately testified that his test is extensive to ensure the safety of the workplace. He did not believe the test conducted by Lounsberry was satisfactory.

Dr. Nathan Cohen's testimony was presented to the jury via deposition. Dr. Cohen testified that he had been an orthopedic surgeon since 1982, with a subspecialty in joint replacement surgery, and was qualified as an expert. He estimated that he performs 300 to 400 joint replacements a year. Dr. Cohen reviewed Hooper's extensive medical history of bilateral knee problems, including arthritis, warranting numerous

doctor visits and steroid injections in the years 2008, 2009, and 2010. In January 2011, Dr. Cohen's notes indicated that Hooper was considering joint replacement surgery. Dr. Cohen noted that Hooper was probably unable to kneel all through this time. In May 2011, Hooper received injections in both knees.

In August 22, 2011, Hooper underwent his first total knee replacement. Dr. Cohen testified that this surgery was successful, so much so that at a follow-up visit on September 14, 2011, Hooper scheduled a right total knee arthroplasty for November 30, 2011. Dr. Cohen testified that there were no complications with this surgery.

At follow-up visits, Dr. Cohen noted that Hooper still complained of pain. Dr. Cohen testified that his complaints were all within the realm of normal considering the amount of time that had elapsed since surgery. Dr. Cohen released Hooper to return to light duty work on March 19, 2012. An April 4, 2012 notation by Dr. Cohen's clinical assistant noted that:

> Doing better. Patient still not ready to return to work due to increase in pain with stair climbing in bilateral knees. And patient's employer doesn't have light-duty work available. Patient also complains of pain on the medial side of his left knee for one month. And he had completed his physical therapy.

Nevertheless, Dr. Cohen released Hooper to return to work on May 2, 2012. Dr. Cohen scheduled Hooper's next appointment in six months. However, Hooper returned to Dr. Cohen's office on May 2, 2012, requesting a work release because:

> . . . he failed the work-hardening program because of his pain level. He states he was trying to be honest with him, and he was able to do all the activities they asked him to do. He said they told him because of his pain level, he can't return to work. He presents today wanting a work release.

Dr. Cohen's notes indicate:

> From my perspective, he is a reasonable candidate to return to full work duties[.] I feel he is capable of completing all of his tasks. He has lived with knee pain for an extensive period of time. Very clearly he can endure some discomfort from time-to-time, yet still continue with his normal work duties.

9

Dr. Cohen testified that he did not have any concerns that Hooper would be a danger to himself or others because his knee replacements were successful. Dr. Cohen was questioned:

> Q. Okay. So is it your opinion based on your years of treatment that he's effectively had the same physical limitations since 2008 through present?
>
> A. Yes. Although mechanically, his knees are certainly a lot better than what they were, given the amount of arthritis that he had in them before. That was all resolved with the procedure.
>
> Q. Okay. So – in some respect, he's actually better than he was in 2008?
>
> A. His knees are certainly capable of a lot more, yes.

On cross-examination, Dr. Cohen was asked:

> Q. . . .You said just now that Mr. Hooper was – from a mechanical standpoint that he was mechanically better is what I wrote down, that he should be capable of more. I feel like there's something more – in our care and evaluation of him that there's more of the story to be told than just the mechanical evaluation of the knee joint in terms of his overall well-being. Is there?
>
> A. Well, I think the answer to that is that his symptoms outweigh his signs. So what that basically means is – and if you have records from Dr. Matthews to confirm my findings as well – although his x-rays looked excellent, all the arthritic complaints, all the arthritic changes had been removed, that physically his knees function in a – in a better fashion that they did before. And if I'm unable to be able to suggest why he's complaining of those symptoms, then I think the answer to that is his symptoms outweigh his signs.
>
> So I – I couldn't come up with a reason why he would be symptomatic. And if his symptoms are the issue at hand right now as to whether he can or cannot work, then I think it's – it becomes a real gray zone as to what you do with a gentleman like that.

Finally, Dr. Cohen described Hooper's complaints as chronic, as he was at maximum medical improvement. Dr. Cohen testified that an FCE is a standard and fair approach to measure a person's work ability.

Hooper testified that Dr. Cohen told him that he could do whatever he wanted to do as long as he could tolerate the pain. He then reviewed with counsel several

applications he filled out for long-term disability. In conjunction with his long-term disability, he was required to file for social security disability benefits. On that form, Hooper indicated that "I became unable to work because of my disabling condition on November 29, 2011." He testified that the pain in his knees was the disabling condition. Hooper was questioned if he believed that he was disabled from all jobs to which he responded, "No. I was disabled from all gainful employment except the job I was working for Louisiana Pigment." Hooper said he could still perform his job at Louisiana Pigment because "he had been doing it for several years in the same condition, pain-wise."

Hooper testified that he worked his way up from his start at Louisiana Pigment in 1992 to outage coordinator by 2006. Hooper testified that once the routine coordinator retired, he took on that position also. Hooper said that his job from 2006 forward involved planning and scheduling. He said he worked in a trailer next to the maintenance building as a planning coordinator. He said he spent about 80% of his time in the office and 20% of his time in the plant.

Hooper was questioned if the maintenance coordinator job description produced by Fontana accurately described the actual job he performed, and he said it did not. Regarding the three-day FCE, Hooper testified that he completed all of the tasks for the first two days. On the first day he rated his pain level at two. On the second day he rated his pain level at six. Upon his return on the third day, Hooper was unable to finish the test because Fontana said he could not continue until he had a doctor's clearance stating that nothing structurally was wrong with his knee and that he would not injure it further by continuing the FCE. Hooper immediately obtained the release from his doctor, but testified that he was instructed to wait for a call from someone at Louisiana Pigment. After he submitted the release to the office on May 10, 2012, Hooper received

11

a letter, dated May 9, 2012, that his employment would be terminated on May 27, 2012.

Hooper was questioned how he felt when he received the letter. He responded:

> Frustrated, angry, confused, just a whole bunch of emotions because I got this letter after the 10th. When I went in on the 11th to give the release to the company nurse, I was instructed to go home, and we'll call you. I know what that means.
>
> I have already had too many employees to be terminated, and that's the last thing you hear. If you're instructed to go home and we will call you, that means it's over. And then when I get this, that's what I am thinking, it's over. But I keep fighting and, you know, trying to call – I do call Quentin [Busby].

Hooper testified that he called Busby and LeDoux and told them it was just a big misunderstanding and requested they meet to straighten things out. Hooper said that LeDoux told him to call Busby to set up a meeting. Hooper called Busby to set up a meeting. After conferring with LeDoux, according to Hooper, Busby called him and told him that there would be no meeting; that they did not want to meet. Hooper testified that Louisiana Pigment never offered him the eleven-day work hardening program nor was he given the ability to complete the third day of testing despite his doctor's release.

Hooper testified as to how much he loved working for Louisiana Pigment. He described the maintenance coordinator position as his dream job. He said the period of time following his termination was one of the worst times of his life. He testified that he "took pride in working and having a job." He said that when he was terminated, "they stripped me of all my dignities and my self-esteem. So it was just a rough time."

On cross-examination, Hooper testified that Jody Vincent came in to train with him two weeks before his first knee surgery so that he could fill in for him while he was out. Hooper testified that Vincent eventually took over as maintenance supervisor, the job that Hooper had previously handled and which at one time was the job of two different people before Hooper starting doing both jobs. Hooper admitted that Louisiana Pigment treated him fairly and accommodated him through all of his

surgeries up to the point of taking off for the November 2011 knee surgery. He testified that he had pain before and after the surgeries and was limited in his ability to climb stairs both before and after any of the surgeries. He admitted that his condition with his knees, from the standpoint of his subjective pain, had not improved since the surgeries.

Hooper then reviewed a series of pictures of the Louisiana Pigment plant evidencing that stairs must be used to get to certain areas and that catwalks are used to move between production buildings. Hooper said that each production building consists of four floors. He admitted that there have been occasional emergencies at the plant requiring evacuations. He testified that for the biggest outage, which had been originally planned for July 2011 but which did not occur until December 2011, he was out because of his second knee surgery and that Vincent performed his job during that time. Defense counsel made a point of showing that at times, Hooper would be "on call" to fill in for duties of other workers if they were out of the plant. All of these positions had broader physical requirements than Hooper's job as maintenance supervisor. Hooper said at times when he was required to do this, he simply switched his radio to a different line in order to be able to listen if assistance was needed in the area but that he continued to do his regular job, primarily in his office.

On re-direct, counsel counted the stairs at the Louisiana Pigment plant as representing one flight of stairs. On day one of the FCE, Hooper walked eleven flights of stairs and reported a pain rating of two at the end of the day. Hooper testified that he had walked the stairs before when he had knee pain and would be able to after the surgeries as well. The four floors of the building comprise six flights of stairs, which again, Hooper was able to complete during the FCE following his surgeries. Hooper testified he was able to perform his job at Louisiana Pigment even as of the date of trial. He reviewed numerous physical activities that involved long periods of walking, climbing stairs, getting in tight spaces, and the like that he had completed in order to

get in the courtroom all week. Hooper testified that he plays golf and cuts grass. Finally, although Hooper "defines" himself first and foremost as a Christian, he testified his job meant a great deal to him, and, the loss of it was devastating to him.

Scott Lounsberry, an athletic trainer, physical therapist assistant, certified strengthening and conditioning coach, and ergonomist, owns a physical therapy clinic and a sports performance center. The physical therapy center, Industrial Strength Work Rehab Center, conducts pre-employment testing, return to work testing, and work conditioning. Lounsberry testified that he creates job descriptions and performs FCEs. Lounsberry described the process of creating a job description and, thereafter, an FCE based on the job duties. He said that he meets with the supervisor to find out what the responsibilities are of the job, then follows an employee who acutally works in the position and records the type of activities they perform on a daily basis.

Lounsberry created a job description for Production Supervisor and an FCE for that position for Louisiana Pigment. Louisiana Pigment approved the criteria for the job description, which consists of a one-page document listing five specific job specifics. The documents states in part:

For the Position

Of

Production Supervisor (CP)[chloride process]

The Company representative hereby acknowledges the following as valid job specific tests:

Job Specific Test I: Carrying a Fire Extinguisher
The employee will demonstrate the ability to safely carry a fire extinguisher 50 feet with one hand.

Job Specific Test II: Silo Climb
The employees will demonstrate the ability to safely ascent 169 steps without exceeding the APMHR [Age Predicted Maximum Heart Rate].

Job Specific Test III: Push/Pull

The employee will demonstrate the ability to push and pull at chest height with a force of 60 lbs.

Job Specific Test IV:  Mobility
The employee will demonstrate the ability to assume a posture of 24 inches off the floor and return to standing without upper extremity support.

Job Specific Test V:  Typing
The employee will demonstrate the ability to type for 5 minutes.

Lounsberry testified that the entire test takes about an hour-and-a-half.  He said that it is more difficult to do a shift supervisor job description because "as the shift supervisor, he doesn't necessarily have [to] do the physical part of the job of turning valves and reading gauges and things like,  but at the end of the day, he is responsible for safety of the whole unit."

Charles Bettinger, an expert forensic economist and statistician, testified via video deposition, which was played for the jury.  Dr. Bettinger determined that Hooper suffered a loss of back pay and future pay.  Dr. Bettinger noted that Hooper had been terminated 6.6 years ago.  Hooper's pay included social security contributions, a 401(k) plan, which Louisiana Pigment matched, and a company retirement program.  Dr. Bettinger determined that Hooper lost $24,944.00 in 401(K) benefits, $38,662.00 in social security benefits, and $38,663.00 in retirement benefits.  He determined Hooper's total loss of back pay at $760,017.00.  He calculated future loss of pay at $409,404.00 for a total of past and future loss at $1,169,421.00.  That calculation did not include a reduction of $88,786.00 based on the slight chance that Hooper would be able to obtain a job making $8.95 to $14.55 per hour.  With that calculation included, Dr. Bettinger determined that Hooper suffered a net future and back pay loss of $1,080,635.00, assuming that he would retire at age 67.

Jackie Guidry, a nurse practitioner since 2005, testified that she worked for BHP in 2011-2012.  She testified that Louisiana Pigment was a client of BHP and that every

15

Thursday morning she would do physicals at the plant. She also met with employees who were off for short-term disability to assess their status every two weeks. Guidry testified that Louisiana Pigment had its own medical office on-site where she would visit with employees. The facility had its own on-site nurse who was employed by Louisiana Pigment, and at that time, it was Sharon Groves. Guidry testified that once she received a release from the employee's doctor:

> What I do is a lot of times as I assess them, it is not unusual working in occupational medicine for the employee to beg the doctor to go back to work. My job is to make sure that the patient is safe enough to go to work. For instance, we've had people that had appendicitis and had an appendectomy and still have sutures and beg their doctor and he says, "Full duty release." I can't let him go back into the construction with these sutures – dirt, anything could happen.
>
> So we basically do not rubber stamp anything. It is based on where he is, what it looks like, and then we decide whether or not to release them.

Guidry then discussed the FCE she ordered Hooper to complete on April 26, 2012. She was questioned:

> Q. Now, this was an order that you issued, correct?
>
> A. Yes, sir.
>
> Q. Did someone tell you, you've got to do it?
>
> A. No, sir.
>
> Q. When you issued it, was there anybody with Louisiana Pigment who was collaborating with you?
>
> A. No, sir.
>
> Q. Had you had any phone calls or any input from Louisiana Pigment that says, I think –
>
> A. No, Sir.
>
> Q. Does it work that way?
>
> A. We have had some try, you know, or the – I've had them try before. But it is basically us. I've had construction companies for some reasons

16

don't want a worker there, you know, oh, no no. And if he's capable, I'm sorry, I'm returning him to work.

Q. Now, you haven't had that experience with Louisiana Pigment, have you?

A. No, sir, I have never.

Guidry testified that although she has been asked by companies to produce a certain result, which she would not do, Louisiana Pigment has never asked her to do that. Guidry stated that Hooper had three surgeries in a little over a year, and he was still having difficulty sitting. Guidry said that because he did not complete the FCE, Hooper was not cleared to return to work.

Jody Vincent testified that he has been employed at Louisiana Pigment for twenty-two years. Vincent testified that in 2011, he was working as a shift supervisor. Vincent said that he was asked to cover for Hooper because he would be out for multiple surgeries. Vincent said that he remained a shift supervisor while he trained with Hooper in order to learn about the maintenance supervisor position. He eventually took over Hooper's job after Hooper was terminated. Vincent testified that his position as maintenance and outage coordinator required desk work as well as work in the unit. He said the job is not sedentary.

Bryan Taylor, the administration manager at Louisiana Pigment since 2009, was questioned why a job description for an FCE was already being created when Guidry did not request one until April 26, 2012. Taylor testified that Guidry wanted an FCE sometime in March before Hooper could return to work, but Guidry did not know that there was not one for Hooper's position. Thus, Taylor testified that he asked Busby to have Fontana create an FCE. Taylor testified that he would have never requested that Fontana create a physical job description if there had not been any talk of an FCE being required. Taylor said that employees are required to take FCEs from time to time through Fontana. He said they were the same three-day evaluations regardless of what

17

job you held. Taylor testified that employees were not treated differently if they were hourly versus salaried workers. He further said that there was no distinction between clerical versus CP or supervisor versus non-supervisor.

Taylor testified that he decided to start using Lounsberry because he was local, and it would be easier and more convenient for employees to obtain return to work evaluations. Taylor said that all of the job descriptions in existence before Hooper were for hourly employees. He said that new job descriptions were created on an as-needed basis. Taylor then discussed the FCE used for Hooper to return to work following his shoulder surgery. Taylor testified that it was decided that Vincent would do all of the physical aspects of the position while Hooper would do the office work. Taylor testified:

> So I asked Kevin to prepare - - and this was a document that I had from somewhere else I had worked. It may have been when I was at Boeing or Westlake Chemical or Lyondell Basell. But it was a form that I had that I had used at a previous job. And I gave it to Kevin and I said, fill this out based on what Mr. Hooper's job requirements are going to be with Jody doing primarily all of the physical aspects of the job.

Thus, according to Taylor, this job description was not an accurate one for Hooper's actual job but limited to office work with Vincent performing the physical activity required of the job. Taylor testified that Hooper was out for forty-five days on short-term disability following the shoulder surgery and forty-five days for the first knee surgery. Taylor said that Vincent performed all of his job duties while Hooper was out, and when Hooper returned from short term disability, Vincent performed all of the physical aspects of his job. Following the second knee surgery, Hooper was out for the full 180 days on short-term disability. Taylor said that between April 2011 and May 2012, Hooper was out for 271 days.

Taylor said that following the first knee surgery, Hooper never really improved and spent a lot of time at work with his knee iced while using ibuprofen. He said that even though he was having all of these issues, Hooper left for the next knee surgery in

November 2011 and never returned.  Taylor testified that he was informed from BHP that following the second surgery, Hooper continued to have issues with his knee.  He further testified:

Q. Did you at any point make a decision to send him to an FCE?

A. No. No.  No, I don't do that.

Q. Why not?

A. Because it's not my job.  That what we use Business Health Partners for.  That is their expertise.  They are medical experts.  I am not.

Q. Did you ever decide that you didn't want him to come back to work?

A. Absolutely not.

Q. Did you want him to come back to work?

A. Absolutely.

Q. Why?

A. Well, Mr. Hooper - - Mr. Hooper is a very good employee, very knowledgeable.  You have heard all of this.  He was there from when the plant was built.  His knowledge of the CP unit was invaluable.  We had a lot of time and money invested in him, and he was a very good contributor to what he did.  It was a big loss for us to lose Mr. Hooper.  And I think if you look at the facts in this case, it is totally opposite that we would try to create some kind of work environment where he couldn't come back.  It was just the opposite.

Q. Why didn't you just let him come back despite – forget about the FCE.  Forget about Ms. Guidry.  He had been doing - - we have heard that.  He had been doing the job for all these years.  Why didn't you just let him come back and do it some more?

A. He was not able to come back until we had medical clearance, and Business Health Partners makes that call.

Taylor said that the letter sent out by Davis was automatic and she sends that letter to every employee within two or three weeks from having their short-term disability end so that they do not experience a lapse in benefits.  Taylor testified that the termination upon the expiration of short-term disability applies to all employees and that it requires the balance between the desire to have an employee return with the need

to have the spot filled. Taylor steadfastly denied that Louisiana Pigment was trying to "get rid of" Hooper. He testified that, on the contrary, they went out of the way to help him by having another person do all of the physical aspects of Hooper's job. Taylor said Louisiana Pigment remained hopeful that Hooper would return after completing the work hardening that Fontana requested of him and did not fill his position until they received Hooper's application for long-term disability.

Tim Hall, the plant manager at Louisiana Pigment, has a PhD in organic chemistry. He has worked for Louisiana Pigment since before the plant was built. He reports directly to the board and coordinates with the two owners regarding business practices. Hall testified that he does not interfere in the medical process involving an employee returning to work. Hall said that it takes five years to have a real quality operator in the CP plant that can perform all of the jobs. He testified that they did everything they could to keep Hooper. He said:

> And I have looked back at this case and I don't know of anything that we could have done different that would have changed the outcome. Because at the end of the day, we had an employee who had a medical problem that had pain, that Louisiana Pigment had nothing to do with.
>
> He wasn't hurt at work. He didn't incur it at work. He didn't incur it in our process or failure to have our PPE, or something that we did. It was a personal injury problem, a personal medical issue. And I didn't know here Louisiana Pigment could do anymore than we did.

After Hall testified, the defendant rested. The jury verdict sheet set forth the following questions for the jury to answer:

> 1. Do you find by a preponderance of the evidence that Herman Lee Hooper has a disability?
> ____X____ YES                    _____ NO
>
> If you answered "YES", to question number 1, please proceed to question number 2. If you answered "NO" to question number 1, please sign this verdict form and return it to the court.
>
> 2. Do you find by a preponderance of the evidence that Herman Lee Hooper is an otherwise qualified person with a disability?
> ____X____ YES                    _____ NO

If you answered "YES", to question number 2, please proceed to question number 3. If you answered "NO" to question number 2, please sign this verdict form and return it to the court.

3. Do you find by a preponderance of the evidence that Mr. Hooper was terminated based on a physical examination that was not directly related to the requirements of his specific job or was not required of all employees who are similarly situated?

   ___X___ YES           _____ NO

4. Do you find by a preponderance of the evidence that the physical examination given to Herman Lee Hooper has been shown to be job-related and consistent with Louisiana Pigment's business necessity, and such performance cannot be accomplished by reasonable accommodation?

   _____ YES           ___X____ NO

If you answered "YES", to question number 4, please sign this verdict form and return it to the court. If you answered "NO" to question number 4, please proceed to questions [sic] number 5.

5. What amount, if any, do you find would reasonably compensate Mr. Hooper for each of the following?

  Lost Wages (including benefits)  $1,052,478.00
  Mental Anguish       $701,652.00

## DISCUSSION

By the time of the trial, the sole issue before the jury was whether Louisiana Pigment violated La.R.S. 23:323(B)(5). The relevant parts of the statute state:

> A. No otherwise qualified person with a disability shall, on the basis of a disability, be subjected to discrimination in employment.

> B. An employer, labor organization, or employment agency shall not engage in any of the following practices:

> . . . .

> (5) Discharge or take other discriminatory action against an otherwise qualified person with a disability on the basis of physical or mental examinations or preemployment interviews that are not directly related to the requirements of the specific job, or are not required of all employees or applicants.

21

*Subsequent FCE Exam Evidence*

In its first assignment of error, Louisiana Pigment argues that the trial court impermissibly allowed the evidence of the less strenuous tests Lounsberry administered to other production supervisors after Hooper's departure as an irrelevant argument to support a violation of the statute. The trial court is vested with vast discretion in connection with the admissibility of evidence. It will not be reversed absent an abuse of that discretion. *Maddox v. Omni Drilling Corp.*, 96-1673 (La.App. 3 Cir. 8/6/97); 698 So.2d 1022, *writs denied*, 97-2766, 97-2767 (La. 1/30/98); 709 So.2d 706. The jury's findings will not be reversed in the absence of manifest error or unless it is clearly wrong. *Stobart v. State through DOTD*, 617 So.2d 880 (La.1993).

There simply was no evidence to suggest that the company singled-out Hooper for a different FCE that would guarantee his departure from the company. On the contrary, they used the same FCE provider they had used for years—Paul Fontana—who was located in Lafayette. Sometime in 2011, Louisiana Pigment decided to switch to a local provider—Scott Lounsberry—and avoid having employees travel to Lafayette and stay overnight in a hotel. Lounsberry himself, along with Louisiana Pigment employees, testified that it was a very lengthy process to switch over because Lounsberry had to create job descriptions for all of the employees. It was not until 2013 that Lounsberry started performing the FCEs for Louisiana Pigment.

As to the FCE that Hooper was subjected to under Fontana, it is true that Hooper was the first salaried employee to be subjected to the test because he was the first salaried employee that ever required one. Fontana had been used for all other employees who had required one in the past. Louisiana Pigment argues it was severely prejudiced by the trial court allowing evidence of the Lounsberry tests, which were undoubtedly less comprehensive, of two subsequent salaried employers to prove that Hooper was singled out for special treatment. We disagree. The jury was presented

with all of the underlying facts surrounding the switch from Fontana to Lounsberry. We find that the jury did not have to rely on this evidence in reaching the verdict that it did. Our review of the evidence reveals no master plan to switch companies in order to terminate Hooper. On the contrary, the switch was for the convenience of the employees to be able to test locally.

Rather, the evidence that stands out as actionable under the statute and upon which the jury did not manifestly err in relying upon, is that Hooper was required to take a test consisting of extreme manual labor that was unrelated to his managerial job requirements. This was evidenced by his past history of return-to-work evaluations that mentioned very little in the way of physical labor. Moreover, when Hooper completed the arduous tasks required of him that were unrelated to his job, he was not allowed to finish the test on the third day even though he had medical clearance to do so. While there was dispute in the testimony as to how that occurred and what happened thereafter regarding the "work hardening," it is reasonable to conclude that Hooper would have completed whatever was asked of him and that none of it would have been related to his job as a production supervisor.

Louisiana Pigment goes to great length to explain that it relied on third-parties to administer its tests and medical clearances, but it was ultimately responsible for hiring Fontana and approving the FCE that Fontana created for the position of "Production Supervisor," which bore no relation to Hooper's actual job duties.

Therefore, a reasonable jury could have concluded that the test that was administered to Hooper, as a manager primarily engaged in office work, set forth requirements *that were not directly related to the requirements of the specific job* of production supervisor. Thus, even if the Lounsberry test evidence had been excluded, the jury still could have found that the Fontana test was not related to the requirements of Hooper's managerial job.

23

In brief, Louisiana Pigment argues that the "sole theory of the case advanced by the plaintiff relied on this strategy to turn this case into a question of whether the two evaluations were different, embodied in the pretrial shift to focus solely on subsection §323.B(5)," and that "this simple difference under the specific circumstances presented in this case cannot, standing alone, sustain a violation of §323.B(5)." Louisiana Pigment argues that this finding creates a "an impossible paradox" for employers because employers would automatically violate §323.B(5) any time they change their procedure or require an employee to take an FCE test or medical exam for the first time. Louisiana Pigment further argues that this holding could be interpreted as not allowing employers to conduct business and choose providers as they see fit if a change in testing automatically signaled a violation of the statute. We disagree. Our holding makes no such finding. Under the particular facts of this case, Louisiana Pigment is ultimately responsible for the timing of the switch, and the history (or lack thereof) of the FCE administration regarding Hooper. That the employee got caught in the middle of the switch does not change the fact that Fontana's FCE had no relation to the actual job performed by Hooper.

Hooper need not prove there was a concerted effort to get rid of him because of his disability. Notably, in the year that Hooper elected to undergo multiple surgeries (none related to his work), Louisiana Pigment undeniably accommodated him until the very end by providing him a laptop to work with at home and by having Jody Vincent assist Hooper with the physical demands of the job when Hooper returned. Hooper's counsel did try to paint Louisiana Pigment as a ruthless corporation looking to get rid of its long-term employee; however, we did not find that the evidence supported such a finding. Nevertheless, Hooper was eager and able to return to work. Louisiana Pigment is responsible for the bureaucratic boundaries it created in order for Hooper to return to work and for the diagnostic criteria that the company it uses employs. Louisiana

24

Pigment had to approve the job description set forth by Fontana, and Louisiana Pigment had the ultimate discretion in determining whether Hooper was able to return to his job.

The jury reasonably determined that the FCE Hooper was required to undergo based on Fontana's job description bore no likeness to the job actually performed by Hooper. We cannot say the jury manifestly erred in its finding. Moreover, we find the jury would have reached the same result even if the Lounsberry test had been excluded. This assignment of error is without merit.

### General Damages

In this assignment of error, Louisiana Pigment argues that the jury, because of the exclusion of the disability income evidence, was probably left with the impression that Hooper was depressed because he was destitute and unable to pay his bills, which was not the case because Hooper received an amount nearly equal to his salary in benefits. We note that the general damage award was left to the total discretion of the jury with Hooper's counsel suggesting no specific amount.

In *Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74 (alteration in original), the standard to be used by an appellate court when reviewing a quantum award was set forth by our supreme court:

> The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993). Moreover,

> before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

25

*Coco v. Winston Indus., Inc.,* 341 So.2d 332, 334 (La.1977) (internal citations omitted).

It is not our role to determine what we feel is an appropriate award. We can only disturb the trier of fact's determination if it abused its discretion. *Youn,* 623 So.2d 1257. Hooper worked for Louisiana Pigment for over twenty years. He did not testify that he was destitute and unable to support his family; he testified he was making ends meet. Hooper testified to the challenging circumstances he was raised in and how being successful at his job was one of his proudest accomplishments in life. Considering Hooper's testimony of how important his job was to him and how the loss of it greatly affected his mental health, we cannot say that the jury erred in awarding him $701,652.00. This assignment of error is without merit.

### *Disability Payment Evidence*

This assignment of error essentially relates to the previous one and the one that follows. Louisiana Pigment argues that the trial court erred when it excluded evidence of Hooper's disability payments, which were relevant to defend the general damage claim. While the trial court allowed evidence of the application for benefits, it did not allow any evidence relating to the payments Hooper actually received in accordance with the instructions of the Louisiana Supreme Court in *Hooper v. Louisiana Pigment Co., LP*, 17-380 (La. 4/13/17), 218 So.3d 627.

Louisiana Pigment argues that La.Code Evid. art. 105 allows the admission of evidence for one purpose that may not be admitted for another purpose.[4] Louisiana Pigment states in brief that "to require a jury to contemplate a general damage award

---

[4] Louisiana Code of Evidence Article 105 states:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. Failure to restrict the evidence and instruct the jury shall not constitute error absent a request to do so.

deprived of these critical facts is improper." It cites several cases for the proposition that "[t]he rule is that a Social Security disability claim is not fatal to a claim under the laws governing an employment claim premised on a disability claim, but it is evidence to be considered by the finder of fact, here the jury[,]" namely *Cleveland v. Policy Mgmt. Syst. Corp.*, 526 U.S. 795, 119 S.Ct. 1597 (1999), and *Smith v. Thurman Oils, Inc.,* 06-743 (La.App. 1 Cir. 12/28/06), 951 So.2d 359, *writ denied*, 07-207 (La. 3/23/07), 951 So.2d 1106, the same cases that the Louisiana Supreme Court cited in its writ opinion in this matter.

In *Cleveland*, the district and appellate courts found that the employee was estopped from proving an essential element of her ADA claim after filing an SSDI claim contending that she was unable to work due to her disability. The Supreme Court disagreed, finding that "the two claims do not inherently conflict to the point lower courts should apply a special negative presumption like the one [applied by the lower courts]." *Id.* at 802. The Supreme Court described various circumstances in which the application for both would not necessarily be at odds with each other. Likewise, in this case, while Hooper's application for SSDI benefits and long-term disability insurance through his work might seem at odds with his claim that he was qualified to do his job, Louisiana Pigment forced Hooper to file or risk losing his long-term disability benefits altogether. Hooper's testimony was that he was qualified to perform his job at Louisiana Pigment and that was the only "gainful employment" he would be qualified for. In this case, Hooper was stuck between a rock and a hard place, yet Louisiana Pigment argues that the jury should have had the "facts" that he received disability payments before it determined its general damage award.

*Cleveland* involved the burden of proof relating to these types of competing and apparently inconsistent claims in summary judgment motions. The Supreme Court held that to defeat summary judgment, the employee must provide an

27

. . . explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807.

*Smith v. Thurman Oils, Inc.*, 06-743 (La.App. 1 Cir. 12/28/06), *writ denied*, 07-207 (La. 3/23/07), 951 So.2d 1106, and the cases cited within it, similarly address the summary judgment issue. The underlying inquiry in this assignment of error is the nature of the evidence Louisiana Pigment sought to have introduced before the jury. This evidence–the payment of benefits by another source–commonly referred to as a "collateral source," is a legal question which is addressed below.[5] The implication from the supreme court's writ opinion does not comport with a finding that the amount of disability payments should have been considered for another purpose as argued by Louisiana Pigment.[6] Accordingly, this assignment is without merit.

***Collateral Source***

Hooper argues as a preliminary matter to this issue, that Louisiana Pigment's answer did not plead the affirmative defense of offset/credit for disability benefits and that it must be pled or it is waived. Hooper relies on *Hyatt v. Mutual of Omaha Ins. Co.*, 14-282, p. 14 (La.App. 3 Cir. 10/1/14), 149 So.3d 406, 415-16:

> Pursuant to La.Code Civ.P. art. 1005, an affirmative defense must be specifically pled in the answer. The determination of whether an issue is an affirmative defense is a question of fact resolved by examining the circumstances of the individual case. *Fishbein v. State*

[5] We note that 2020 Louisiana House Bill No. 692 is currently proposed before the legislature and seeks to enact La.R.S. 9:2800.25, which would specifically provide that any benefits received by a plaintiff from a collateral source shall be disclosed to the trier of fact.

[6] The Supreme Court's reference to *Cleveland* would imply that Hooper's application for disability benefits claiming that he could not work could be explained in testimony as occurred in this case when Hooper testified that he had no other alternative but to file for benefits, and that he was not capable of finding "gainful employment" of the type he had at Louisiana Pigment.

*ex rel. LSU Health Sciences Ctr.*, 06–549 (La.App. 1 Cir. 3/9/07), 960 So.2d 67, writ denied, 07-730 (La.6/22/07), 959 So.2d 495. "[A]n affirmative defense raises a new matter, which assuming the allegations in the petition are true, constitutes a defense to the action. The new matter must be one, however, that is not raised in the plaintiff's petition." *Sher v. Lafayette Ins. Co.*, 07-2441, p. 23 (La.4/8/08), 988 So.2d 186, 204. Offset has been recognized as an affirmative defense which must be specifically pled in the defendant's answer. *Ducote v. City of Alexandria*, 95-1197 (La.App.3 Cir. 3/6/96), 670 So.2d 1378.

Although there are a number of cases finding that offset is an affirmative defense that must be pled, under the unique facts of this case, we find Louisiana Pigment's request for credit pursuant to the collateral source rule did not need to be pled as an affirmative defense because it does not raise a new matter. *See Fishbein v. State ex rel. LSU Health Sciences* Center, 06-549 (La.App. 1 Cir. 3/9/07), 960 So.2d 67, *writs denied*, 07-708 (La. 6/22/07), 959 So.2d 505, 07-730 (La. 6/22/07), 959 So.2d 495. Hooper had fair notice that the collateral source issue would be significant in this case. *See* La.Code Civ.P. art. 1005. Moreover, this issue is ultimately rendered moot by our finding that disability plan benefits are a collateral source.

Louisiana Pigment argues that the trial court erred in disallowing a credit for disability payments funded and paid by Louisiana Pigment, payments that do not fall within the definition of the collateral source rule. The trial court allowed evidence of the payments to be entered into the record (outside the presence of the jury), but denied any credit based on these payments. Louisiana Pigment argues that these benefits do not constitute a collateral source. It argues that because the payments were made by Louisiana Pigment, denying it a credit "encourages (if not teaches) the defendant to end the payments and terminate what is a voluntary program." Louisiana Pigment argues that it will be made to pay twice if this ruling stands. The benefits amounted to a credit of 67% against the future income claim.

This case presents a novel set of circumstances unaddressed by existing jurisprudence–whether an employer-provided long-term disability policy earned by an

employee–is a collateral source when the employer is held liable for lost wages for violating the discrimination statute. In *Bellard v. American Central Ins. Co.*, 07-1335, 07-1399, pp. 18-19 (La. 4/18/08), 980 So.2d 654, 668, the supreme court defined the collateral source rule and its jurisprudential underpinnings (emphasis added)(citations omitted):

> [T]he rule provides that "a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff *from sources independent of the tortfeasor's procuration or contribution.*" Under the collateral source rule, payments received from an independent source are not deducted from the award the aggrieved party would otherwise receive from the wrongdoer. As a result, the tortfeasor is not allowed to benefit from the *victim's foresight in purchasing insurance and other benefits*.
>
> Several public policy concerns support the collateral source doctrine. The concern most often voiced is that the tortfeasor should not gain an advantage from outside benefits provided to the victim *independently of any act of the tortfeasor*. The objective in this regard is to promote tort deterrence and accident prevention. Another concern advanced is that, absent the collateral source rule, victims would be dissuaded from purchasing insurance or pursuing other forms of reimbursement available to them.
>
> Of the reasons cited in support of the rule, "[t]he major policy reason for applying the collateral source rule to damages has been, and continues to be, tort deterrence." In other words, the rule is grounded in the belief that the tortfeasor should not profit *from the victim's prudence in obtaining insurance*, and that reducing the recovery by the monies paid by a third party would hamper the deterrent effect of the law.

Hooper argues the payments were properly excluded as inadmissible collateral source evidence, relying on law stating that in determining whether a benefit plan that is wholly funded by the tortfeasor is a collateral source, the ultimate inquiry remains whether the tortfeasor established by plan as a prophylactic measure against liability. Hooper argues the proper focus is not what the tortfeasor should pay, but what the plaintiff should receive, and that Louisiana Pigment should not be given a "discrimination bonus" in that it would pay less than it would have if it acted lawfully.

Hooper's counsel states that "regardless of whether Mr. Hooper will receive a windfall, Louisiana Pigment should not receive a reward for its unlawful acts."

Applying the language used by the supreme court in *Bellard* does not work under the facts of this case. The tortfeasor paid for the long-term disability policy and offered it as an employment benefit to long-term workers. Hooper did not purchase the policy and is, therefore, not punished for his forethought in obtaining insurance. However, Hooper did, in a sense, earn the policy through his years of dedicated service to the company. The supreme court recently addressed a collateral source case involving written-off expenses through worker's compensation in *Simmons v. Cornerstone Invest., LLC*, 18-735, pp. 8-9 (La. 5/8/19), 282 So.3d 199, 205 (emphasis added), stating:

> Last, we find if Plaintiff prevails on the merits, a recovery of the reduced amount of medical bills will make him whole, which is an important consideration of both tort recovery and the application of the collateral source rule. La. Civ. Code art. 2315. The plaintiff was never obligated to pay more than the discounted amount and under our civilian code of liability, *Plaintiff should not profit from a tortfeasor in the absence of the availability and proof of punitive damages*. In *Chauvin v. Exxon Mobil Corp.*, 2014-0808, p. 10 (La. 12/9/14), 158 So.3d 761, 768, this court stated:
>
>> The general public policy in Louisiana is against punitive damages. *Ross v. Conoco, Inc.*, 02-0299, p. 14 (La. 10/15/02), 828 So.2d 546, 555. Thus, punitive or other penalty damages are not allowed unless expressly authorized by statute. And even when a statute does authorize the imposition of punitive damages, it is strictly construed. *Id.*
>
> Plaintiff places much emphasis on tort deterrence, essentially arguing that it, as a public policy factor, overrides competing concerns regarding double recovery. We acknowledge the important role of tort deterrence within our tort system; however, to stretch the argument to include the award of un-incurred medical expenses, in addition to those actually paid, is to effectively authorize the assessment of punitive damages in the absence of statutory authority. Thus, in this case, we find *there is no true deterrent effect* to allowing Plaintiff to recover expenses over and above what was actually paid.

Although the circumstances in *Simmons* are different (the plaintiff did not actually incur the written-off expense), we still have two competing interests in this case: tort deterrence versus punitive damages against the employer.

In this case, as in some maritime cases, the tortfeasor is also the independent source that funds the disability plan. In *Wendelboe v. Seariver Maritime, Inc.*, 06-13 p. 4 (La.App. 1 Cir. 11/3/06), 950 So.2d 826, 828, the first circuit court of appeal determined that, "[a]s these conceptual identities are merged in the same entity, there is no true collateral source here. The inquiry hinges on the nature of the plan at issue." Thus, the plan is either a "fringe benefit" for the employee or was created and funded to shield the employer from liability from injuries. *Id.* The primary inquiry, secondary to whether the employer funded the plan, is "the character of the benefits received." *Id.* Fringe benefits cannot be set off against tort recovery, whereas "conscious indemnification mechanisms" can be set off against tort recovery. *Id.* at 829. The factors include:

> (1) whether the employee makes any contribution to funding of the disability payment, (2) whether the benefit plan arises as the result of a collective bargaining activity, (3) whether the plan and payments under it cover both work-related and non-work-related injuries, (4) whether payments from the plan are contingent upon length of service of the employee, and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment recovered in a tort action. *Allen v. Exxon Shipping Co.*, 639 F.Supp. 1545, 1548 (D.Me.1986).

*Id.*

In this case, the employee did not contribute to the plan nor did the plan arise as the result of a collective bargaining activity; the plan covered both work-related and non-work related injuries; the plan was contingent upon length of service, although it is unclear from the record what that length of time was; and, the terms of the salaried long-term disability plan in the materials produced by Louisiana Pigment state that the policy provides for offsets, including: "Any amount you receive due to income

32

replacement or lost wages paid to you by compromise, settlement, or other method as a result of a claim for any other income benefit." The Sun Life long term disability income benefits policy states in part:

**Other Income Benefits**

Other Income Benefits are those benefits provided or available to the Employee while a Long Term Disability Benefit is payable. These Other Income Benefits, other than retirement benefits, must be provided as a result of the same Total or Partial Disability payable under this Policy. Other Income Benefits include:

1. The amount the Employee is eligible for under:

. . . .

f. any other act or law of like intent.

. . . .

9. Any amount due to income replacement or lost wages the Employee receives by compromise, settlement or other method as a result of a claim for any Other Income Benefit.

The terms of the policy in *Wendelboe* were as follows:

Under section 2, "Long Term Disability Benefit," subsection 2.5 sets forth the "amount of each monthly installment" due to an injured worker. This amount is to be "equal to the excess, if any, of the person's Long–Term Disability Standard over. . .[t]he amount of any judgment or settlement payable to a disabled person by a service-oriented employer on account of a claim for personal injuries, including. . .a claim arising under the Jones Act (46 U.S.C.App. § 688) or a claim for maintenance and cure arising under general U.S. maritime law."

Continuing to section 3, "Denial of Benefits," subsection 3.1 allows that the employer may deny benefits under the plan if it determines that the worker has been "paid a sum by the employer under a judgment for personal injuries or for maintenance and cure while benefits are paid or payable under this Plan, until denied benefits that would have been payable to such person equal the total of such sum so paid by the employer."

*Id*. at 829.

The plan in *Wendelboe* clearly expressed an intent to avoid double-liability. The court in *Wendelboe* determined that the employer's intent to avoid double-liability must

33

be observed; otherwise the collateral source rule would inhibit employers from providing such policies. Thus, the injured seaman's recovery would be set-off by the employer-provided disability plan. The language in the Louisiana Pigment policy book and the Sun Life policy are less certain. These provisions only imply that a credit would be due to Sun Life if the employee receiving benefits receives benefits from another source.

Although we do not find that Louisiana Pigment was an intentional tortfeasor or provided the policy as a "prophylactic measure against liability," we find that the deterrent effect of the collateral source rule still outweighs the employer's interest in this case. Otherwise, every long-term disability policy would function as an insurance policy for violations of La.R.S. 23:323. Because the employment discrimination arena is significantly different than a seaman injured while working, we do not find that the same policy considerations would be served if this long-term disability policy were considered a collateral source. Although this novel issue presents a close-call in considering competing policy considerations, we find the long-term disability policy payments, earned through Hooper's tenure at the company, are a collateral source and that Louisiana Pigment is not due a credit for offset. Accordingly, this assignment of error is without merit.

***Attorney Fees and Costs***

In this assignment of error, Louisiana Pigment argues that because Hooper's counsel did not seek to sever this claim from the issues assigned to the jury, nor did Louisiana Pigment agree to waive its right to the have the fee claim decided by the jury, the claim was extinguished. Louisiana Pigment cites no law in support of this argument but states in brief:

> The fee claim should have gone to the jury. Louisiana Pigment would
> have maintained its right to have this question go before the jury to
> avoid what Louisiana Pigment believes occurred: the jury included an

34

inflated general damage award to account for the costs of legal representation. A fee claim can be severed and placed with the trial court, but that did not happen here. There was no such agreement to take this issue from the jury. On this basis, Louisiana Pigment maintains the claim was waived in the same manner any other claim for recovery not included in the verdict sheet would be lost not severed.

Louisiana Pigment fails to point out where it objected to the jury verdict form. It cannot now avail itself of hindsight and what it wishes it would have done.

Secondly, and in the alternative, Louisiana Pigment argues that the trial court abused its discretion in awarding $567,175.50 in attorney fees and that an award of $120,000.00 more than adequately satisfies this claim. Louisiana Pigment essentially argues that the trial court refused to make an award based on a 1/3 contingency fee contract amount, and plaintiff's counsel thereafter underwent recreating records so that the total would equal that amount. We disagree.

Louisiana Revised Statutes 23:303(A) authorizes the award of attorney fees in matters such as this one:

> A plaintiff who has a cause of action against an employer, employment agency, or labor organization for a violation of this Chapter may file a civil suit in a district court seeking compensatory damages, back pay, benefits, reinstatement, or if appropriate, front pay, reasonable attorney fees, and court costs.

In *Fahed v. Ayesh*, 16-748, p. 12 (La.App. 3 Cir. 2/15/17), 211 So.3d 1179, 1187-88, a panel of this court summarized the law pertaining to the award of attorney fees:

> In *Stanley v. Crowell & Owens, LLC*, 15-395, pp. 3-4 (La.App. 3 Cir. 10/7/15), 175 So.3d 1204, 1207-08, *writ denied*, 15-2035 (La. 1/8/16), 184 So.3d 694, this court reviewed the law regarding appellate review of an attorney fee award:
>
> > This court reviews the trial court's award of attorney fees under the abuse of discretion standard. *Covington v. McNeese State Univ.*, 12-2182 (La. 5/7/13), 118 So.3d 343. In *Covington*, the supreme court stated that in applying that standard, "the role of the reviewing court is not to determine what it considers to be an appropriate award, but rather it is to review the exercise of discretion by the trier of fact." *Id.* at 351. Still, we review the trial court's factual findings in reaching the award at

35

issue pursuant to the manifest error/clearly wrong standard. *Stobart v. State, Dep't of Trans. & Dev.*, 617 So.2d 880 (La.1993); *Cottonport Bank v. Keller Prop. Mgmt., LLC*, 13-649 (La.App. 3 Cir. 12/11/13), 128 So.3d 668.

Additionally, the trial court has discretion in determining the amount of an attorney fee based upon its own knowledge, the evidence, and its observation of the case and the record. *Custom-Bilt Cabinet & Supply, Inc. v. Quality Built Cabinets, Inc.*, 32,441 (La.App. 2 Cir. 12/8/99), 748 So.2d 594. In fact, a court does not have to hear evidence concerning the time spent or hourly rates charged in order to make an award since the record will reflect much of the services rendered. *Burford v. Burford*, 95-2318 (La.App. 1 Cir. 6/28/96), 677 So.2d 722. When the nature and extent of the services of an attorney are shown by the record, it is the duty of the court to bring to bear its knowledge of the value of the services of counsel and to fix the value even in the absence of expert testimony. *Mitchell v. Turner*, 588 So.2d 1305 (La.App. 2 Cir.1991).

The factors to be considered in determining the reasonableness of an attorney fee award on appeal include:

(1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) amount of money involved; (5) extent and character of the work performed; (6) legal knowledge, attainment, and skill of the attorneys; (7) number of appearances made; (8) intricacies of the facts involved; (9) diligence and skill of counsel; and (10) the court's own knowledge.

*State, Dep't of Transp. & Dev. v. Williamson*, 597 So.2d 439, 442 (La.1992).

Hooper's counsel submitted significant documentary evidence regarding the work she and her law firm conducted in this matter over a period spanning six years. Counsel obtained a favorable result for her client. The litigation is the first of its kind and required significant skill to prove the elements under the statute. We find no abuse of trial court's discretion in awarding $567,175.50 in attorney fees. This assignment of error is without merit.[7]

---

[7] In brief, Hooper's counsel requests attorney fees for work performed on appeal. However, counsel did not answer the appeal requesting attorney fees for work on appeal, thus we are precluded from awarding attorney fees for work performed on appeal. *See* La. Code Civ.P. art. 2133; *LaSalle v. LaSalle*, 03-293(La.App. 3 Cir. 10/1/2003), 856 So.2d 142, and *Dugas v. Aaron Rents, Inc.*, 02-1276 (La.App. 3 Cir. 3/5/03), 839 So.2d 1205.

### *New Trial, Judgment Notwithstanding the Verdict, Remittitur*

In this assignment of error, Louisiana Pigment argues that, based on all of the above arguments, the trial court should have granted a new trial, judgment notwithstanding the verdict (JNOV), or remittitur.

> A trial court can grant a JNOV only when a jury's verdict is one which reasonable people could not have rendered; if reasonable persons could have arrived at the same verdict given the evidence presented to the jury, then a JNOV is improper. The standard to be applied by the appellate courts in reviewing the grant or the denial of a JNOV is whether the trial court's findings in rendering the JNOV were manifestly erroneous. *Bertrand v. Air Logistics, Inc.*, 01-1655, p. 13 (La.App. 3 Cir. 6/19/02), 820 So.2d 1228, 1237.

*Mouhot v. Twelfth Street Baptist Church*, 06-1283, p. 3 (La.App. 3 Cir. 2/7/07), 949 So.2d 668, 670.

At the hearing on the motions, Louisiana Pigment argued that the trial court agreed to give it a credit for the disability payments that had been paid by Louisiana Pigment 100% amounting to 67% of the payment he received as the other portion was paid by social security disability income. Louisiana Pigment again argued that the disability payment is not a collateral source because it is an employee suing his employer and the benefits were generated directly and solely through the payments made by Louisiana Pigment. Hooper argues that Louisiana Pigment could have put on expert testimony but they did not and that the benefits were earned by Hooper unlike an insurance policy which one pays for. Hooper argues that the employer is the tortfeasor, and the "tortfeasor deterrent" purpose is met because the employer caused Hooper to lose his job.

As the trial court noted at the hearing on the JNOV,

> The plaintiff was given a test. Whether the defendant specifically set that test up ideally to get rid of Mr. Hooper, the Court itself is not convinced of that. However, they did contract with an independent contractor. They did set up what the Court does agree to be an onerous test, and the jury also completely found that the results of that test were

factually supportive of employment discrimination, and, therefore, found against the defendant.

The trial court noted that the supreme court specifically indicated that no monetary amounts should be allowed to go before the jury. The trial court then found:

> In reviewing the arguments, this is one of somewhat of a first appearance with regard to the statute. One, I think I find as a matter that the benefit, at least based on the Court's review of the testimony, was for his years of service and status with the company, that is was not offered to every individual. So, it was somewhat unique. Also, the purpose of what we consider a collateral source is a deterrent. And, I think I have to disagree with the defendant's argument as to this not being any type of a deterrent. If someone feels that they could put a policy that would basically give them immunity from any type of provision provided for by law would be – have a different system in its entirety.
>
> The bottom line is that the Court is going to find that his was a collateral source, that the funds are unique, that the funds were something that was incurred as a result of benefits to Mr. Hooper, and that it's within the jury's province to make that determination. At this time the Court declines to make any reduction in the wage award.
>
> And, with regard to reviewing the general damage award, I cannot find that that – I do not find that reasonable minds could never reach that award. They clearly appreciated Mr. Hooper's impact.

Based on the reasoning set forth by the trial court as well as our review of the assignments of error, we find no error in the trial court's denial of Louisiana Pigment's motions. Reasonable jurors could arrive at the verdict and damage awards in this case. Accordingly, this assignment of error is without merit.

## CONCLUSION

The judgment of the trial court awarding the plaintiff-appellee, Herman Lee Hooper, $1,754,130.00 plus legal interest and court costs is affirmed. The award of $567,175.50 in attorney fees is affirmed. All costs of this appeal are assessed against the defendant-appellant, Louisiana Pigment Company, LP.

**AFFIRMED**.