950 So.2d 826 (2006)
Matthew WENDELBOE
v.
SEARIVER MARITIME, INC.
No. 2006 CA 0013.
Court of Appeal of Louisiana, First Circuit.
November 3, 2006.
*827 Gary P. Koederitz, Baton Rouge, Counsel for Plaintiff/Appellee Matthew Wendelboe.
Thomas J. Wagner, Thomas A. Rayer, Jr., New Orleans, Counsel for Defendant/Appellant SeaRiver Maritime, Inc.
Before: PETTIGREW, DOWNING, and HUGHES, JJ.
HUGHES, J.
Defendant, SeaRiver Maritime, Inc., appeals from the trial court's denial of its motion for summary judgment and granting of Plaintiff Matthew Wendelboe's motion for summary judgment. For the reasons that follow, we reverse and render judgment in favor of SeaRiver Maritime, Inc.

I. FACTS AND PROCEDURAL HISTORY
On December 9, 1992, Plaintiff, Matthew Wendelboe, was aboard the Exxon New Orleans, a vessel owned and operated by Defendant, SeaRiver Maritime, Inc. (SeaRiver). Mr. Wendelboe served as the vessel's chief engineer and safety coordinator. The vessel was in the northern Pacific Ocean en route from Valdez, Alaska to Anacortes, Washington. On that date, Mr. Wendelboe accompanied the vessel's chief mate onto the deck of the vessel to inspect and repair a broken door. While the two men were engaged in this activity, a powerful wave struck the vessel and washed the chief mate away into the sea.[1] The wave nearly washed Mr. Wendelboe away as well, but he held onto a rail on the vessel's deck.
Mr. Wendelboe survived the wave but sustained what appears to have been a substantial wrist injury. SeaRiver paid Mr. Wendelboe's maintenance in the amount of $11,240.00, medical expenses in the amount of $17,206.65, and ongoing disability benefits totaling $460,000.00 through the onset of this litigation. Mr. Wendelboe sued SeaRiver in November 1995, alleging negligence and seeking damages under the Jones Act, 46 U.S.C.App. § 688(a), and general maritime law. After the parties concluded discovery, each filed a motion for summary judgment on the question whether the disability benefits paid to Mr. Wendelboe amounted to a fringe benefit of his employment and thus a collateral source of recovery or if SeaRiver could offset the benefits already paid to Mr. Wendelboe against any judgment he might receive in court and thus avoid double payment. These motions were heard on November 15, 2005. The trial court issued oral reasons on the same day, finding for Mr. Wendelboe and concluding that the disability plan was a "fringe benefit." Thus, SeaRiver was not "entitled to a reduction." SeaRiver has appealed, alleging legal error.

II. LAW AND ANALYSIS
The parties have agreed that no factual dispute exists; this case presents a question of law subject to de novo review on *828 appeal: did the trial court err in granting Mr. Wendelboe's motion for summary judgment, thus shielding his disability benefits from offset by SeaRiver against any tort litigation recovery he may receive?
In the Jones Act of 1920, Congress granted maritime workers the right to sue their employers for negligence. The Jones Act incorporates the Federal Employers' Liability Act (FELA)[2] by reference. Presumptively, therefore, FELA jurisprudence is authoritative in Jones Act cases, and vice versa. David W. Robertson & Michael F. Sturley, Recent Developments in Admiralty and Maritime Law at The National Level and in the Fifth and Eleventh Circuits, 30 Tul. Mar. L.J. 195, 232 (2006); see also Cox v. Roth, 348 U.S. 207, 208, 75 S.Ct. 242, 99 L.Ed. 260 (1955). This is such a case, as it asks us to determine whether the worker disability plan provided by SeaRiver contained a provision, as contemplated by FELA, wherein a common carrier being sued may "set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee . . . on account of the injury or death for which said action was brought." 45 U.S.C. § 55.
FELA, and by extension, the Jones Act, operate in this context to create an exception to the "collateral source" rule, which holds that if an injured party receives compensation for its injuries from a source independent of the tortfeasor, the payment should not be deducted from the damages that the tortfeasor must pay. Black's Law Dictionary (7th ed.1999); see also Davis v. Odeco, Inc., 18 F.3d 1237, 1243 (5th Cir.1994). The rationale for this exception is to protect an employer that has purposefully sought to indemnify itself against double liability by providing a self-funded plan to compensate workers for injuries that may lead to litigation. Assuming such a plan or fund is proper and fair, FELA allows an employer to credit plan payments against any recovery in tort so that the plaintiff does not recover doubly. Clark v. Burlington N., Inc., 726 F.2d 448, 450 (8th Cir.1984) (citing Haughton v. Blackships, 462 F.2d 788, 791 (5th Cir.1972)).
Maritime cases like the one at bar do not present a typical collateral source rule application. As Black's definition notes, the "collateral source" is one that is "independent of the tortfeasor," such as a tortfeasor's insurance company, whose potential liability cannot be offset or reduced if a plaintiff receives compensation from the plaintiff's own insurer. Here, as in many cases involving maritime enterprises and railroads, SeaRiver is both the alleged tortfeasor and the would-be "independent" source that funds the disability plan. As these conceptual identities are merged in the same entity, there is no true collateral source here. The inquiry hinges on the nature of the plan at issue.
The case at bar presents the issue of how such a fund or plan is to be characterized. Either, as guided by FELA, the employer has created and funded the plan specifically to shield itself against liability for injuries to workers or the plan has another independent purpose, such as to provide deferred compensation or some other fringe benefit to workers. Whether the employer is the source of the fund or plan clearly matters, but case law notes that the primary analytical emphasis remains on determining the "character of the benefits received." Clark, 726 F.2d at 450 (citing Haughton, 462 F.2d at 791).
SeaRiver argues that the trial court erred in deeming the disability plan *829 at issue a fringe benefit and thus not subject to offset because it covered both work-related and non-work-related injuries. This brings up one of the factors in the jurisprudential test used to discern between fringe benefits, which cannot be set off against tort recovery, and conscious indemnification mechanisms, which can be set off against tort recovery. The factors include: (1) whether the employee makes any contribution to funding of the disability payment, (2) whether the benefit plan arises as the result of a collective bargaining activity, (3) whether the plan and payments under it cover both work-related and non-work-related injuries, (4) whether payments from the plan are contingent upon length of service of the employee, and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment recovered in a tort action. Allen v. Exxon Shipping Co., 639 F.Supp. 1545, 1548 (D.Me.1986).
Here, factors (1) and (2) are not contested: employees do not contribute to the SeaRiver plan and it is not the result of a collective bargaining agreement. Regarding factors (3) and (4), the SeaRiver plan does provide coverage for both work-related and non-work-related injuries, but it treats them distinctly. The primary difference for this inquiry is that work-related injuries are covered by the plan regardless of the worker's tenure, but benefits for non-work-related injuries depend to a degree on the worker's tenure. Although the trial court emphasized this factor, we do not find it dispositive in the case at bar.
The final factor, whether the plan includes specific language indicating its purpose as a set-off mechanism, has been the subject of debate between the parties. The pertinent SeaRiver provisions are as follows. Under section 2, "Long Term Disability Benefit," subsection 2.5 sets forth the "amount of each monthly installment" due to an injured worker. This amount is to be "equal to the excess, if any, of the person's Long-Term Disability Standard[3] over . . . [t]he amount of any judgment or settlement payable to a disabled person by a service-oriented employer[4] on account of a claim for personal injuries, including . . . a claim arising under the Jones Act (46 U.S.C.App. § 688) or a claim for maintenance and cure arising under general U.S. maritime law."
Continuing to section 3, "Denial of Benefits," subsection 3.1 allows that the employer may deny benefits under the plan if it determines that the worker has been "paid a sum by the employer under a judgment for personal injuries or for maintenance and cure while benefits are paid or payable under this Plan, until denied benefits that would have been payable to such person equal the total of such sum so paid by the employer."
Mr. Wendelboe argues that these plan provisions contain no language to the effect that an employer may "reduce its tort liability by the amount of the benefits paid to the plaintiff/employee," only language, rather, that "could result in a reduction of disability benefits to the claimant, depending upon resolution of a tort claim against the employer." SeaRiver argues that the statute requires no "talismanic language" and that "the intent of *830 the employer [through the plan] to avoid a double payment is what controls."
SeaRiver is correct on this point. The FELA provision in 45 U.S.C. § 55, as incorporated into the Jones Act, requires no "magic words."[5] It demands, rather, a showing that the injury for which the worker received benefits be the basis of the action and that the benefits received by the worker in payment concerning that injury be sourced from a fund or plan ("any insurance, relief benefit, or indemnity") that includes contributions or payments by the employer for that purpose.
The SeaRiver plan language, albeit with some difficulty, attempts to express and succeeds in conveying the company's intent to avoid double payment for both benefits and tort recovery. In the monthly calculations from section 2.5, SeaRiver clearly claims the right to credit any judgment or settlement payments it makes to an injured worker against the monthly amount due. Similarly, in section 3.2, SeaRiver clearly claims the right to deny benefits outright (which we believe includes the "lesser" approach of reducing benefits) to the extent that it has paid amounts as a result of a judgment for personal injuries or for maintenance and cure for a particular injury.
Mr. Wendelboe argues that the plan anticipates an after-the-fact reduction of disability benefits as a result of tort recovery, but not a reduction of tort recovery concurrent with and to the extent of disability benefits received. This approach attempts a semantic distinction that does not hold up on application. It is our opinion that the policy of judicial efficiency and the intent of 45 U.S.C. § 55 do not entertain that approach. We suggest, rather, that the statute allows an injured worker to begin collecting employer-funded disability benefits for his injury in an expedited manner, far more quickly and reliably than dependence on litigation recovery. Should the employee decide to sue his or her employer, any recovery will still derive from the employer, not from an outside source.
As a final policy point, SeaRiver argues that the likely and logical result of finding for Mr. Wendelboe and allowing double recovery under SeaRiver's disability plan will be employers' reluctance to continue providing such plans. This point is valid. Knowing that providing such plans may expose them to the obligation of double payment, and knowing also that the set-off provision of 45 U.S.C. § 55 may not protect them, employers will have little incentive to maintain such plans. It will be less costly for employers to simply settle or defend lawsuits as they arise, and maritime employees may likely find themselves with a cause of action under the Jones Act, but little else.
The statute's language clearly aims to provide a means by which employees can receive employer assistance and compensation for their injuries and employers have an incentive to provide such benefits while protecting themselves against double payment obligations. In the case at bar, SeaRiver has drafted a plan that clearly expresses its intent to do so, in accordance with the statute. In the words of one court, "the employer's manifest intent to *831 avoid double liability in offering disability plans must be respected if the collateral source rule is not to swallow up 45 U.S.C. § 55 at the ultimate expense of employees." Clark, 726 F.2d at 451.

CONCLUSION
For the above and foregoing reasons, we reverse the trial court's November 28, 2005 judgment and hereby render judgment in favor of Defendant, SeaRiver Maritime, Inc. Each party is to bear its own costs.
REVERSED.
DOWNING, J., concurs.
NOTES
[1] The chief mate was lost at sea and his body was never found.
[2] 45 U.S.C.A. §§ 51-60.
[3] Section 2.6 of the SeaRiver plan defines this figure as, with occasional modifications, 50% of the worker's monthly recognized compensation as of the beginning of the month within which the injury occurs or the plan otherwise becomes payable.
[4] The SeaRiver plan apparently employs underlining to designate terms defined within the plan; this usage does not seem to suggest any particular substantive emphasis.
[5] "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: Provided, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought."