**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3750-17T2

CARL LUPIA,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

PORT AUTHORITY
TRANS-HUDSON
CORPORATION,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued September 11, 2019 – Decided August 11, 2020

Before Judges Koblitz, Gooden Brown and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3939-15.

Thomas R. Brophy argued the cause for appellant/cross-respondent (Port Authority Law Department, attorneys; Thomas R. Brophy, of counsel and on the briefs).

Charles Arthur Cerussi argued the cause for respondent/cross-appellant (Cerussi & Gunn, PC,

attorneys; Charles Arthur Cerussi, of counsel and on the briefs).

PER CURIAM

Defendant Port Authority Trans-Hudson Corporation (PATH) appeals from a final judgment in the amount of $469,500, entered pursuant to a jury verdict in favor of plaintiff Carl Lupia, a PATH employee injured in a workplace incident. In molding the final judgment, the trial judge accepted plaintiff's interpretation of the Federal Employers' Liability Act (FELA) set-off provision embodied in 45 U.S.C. § 55, allowing defendant to set-off its pre-trial payment of $819,111.72 in stipulated damages for past medical expenses. Thus, in calculating the final judgment, the judge first added the stipulated damages amount to the $939,000 jury award for a gross damages amount of $1,758,111.72. Thereafter, the judge subtracted the stipulated damages amount from the gross damages amount, to arrive at a net of $939,000. Finally, the judge reduced the net by plaintiff's fifty-percent comparative fault found by the jury for a final judgment of $469,500.

On March 16, 2018, the judge entered a memorializing order denying defendant's post-trial motion to alter or amend the judgment pursuant to Rule 4:49-2. In appealing the March 16 order, defendant challenges the court's interpretation of FELA's set-off provision, arguing that the $939,000 jury award

and $819,111.72 in stipulated damages for past medical expenses should have first been combined for a total gross damages amount of $1,758,111.72, and then reduced by plaintiff's fifty-percent comparative fault for a net damages amount of $879,055.86. Thereafter, according to defendant, its payment of $819,111.72 in past medical expenses included in the stipulated damages amount should then offset the net, resulting in PATH being liable for only $59,944.14.[1] Plaintiff cross-appeals, arguing that if we agree with defendant's methodology for calculating the set-off, then plaintiff is entitled to a new trial on damages only, or, in the alternative, an additur, because $59,944.14 is a manifestly unjust award. Because we affirm, we need not address plaintiff's cross-appeal.

We glean these facts from the record. On February 12, 2015, while performing an inventory check in a small equipment room at the Journal Square PATH station in Jersey City, a shelving unit detached from the wall, striking plaintiff and knocking him to the ground, resulting in plaintiff sustaining injuries. On the same date, plaintiff completed and signed a PATH Employee Occupational Injury Report (injury report), in which he stated that as a result of the incident, he suffered injuries to his "[h]ead," "neck," "back," "left hand,"

---

[1] Defendant also claimed a lien of $469.73 for a Railroad Retirement Board Sickness Advance payment, to further reduce its proposed net award to $59,474.41. Plaintiff does not dispute the $469.73 lien.

"left ankle," and "right shoulder," and sustained "cuts on [his] forehead [and] nose."

In the injury report, plaintiff acknowledged:

> I hereby apply for payment of all necessary medical expenses authorized by the Port Authority Office of Medical Services arising out of an alleged injury on duty on [February 12, 2015,] at [the equipment office]. I understand and acknowledge that PATH . . . has the right to a lien for any such medical expenses against any subsequent judgment or settlement of any action brought against PATH . . . arising out of said alleged injury on duty and I also understand and acknowledge that any payment by PATH . . . of such medical expenses is made on the specific condition that such payment is in no way an admission on the part of . . . PATH as to any liability for said alleged injury on duty.
>
> . . . PATH . . . WILL NOT UNDERTAKE NOR CONTINUE TO MAKE THE PAYMENT OF ANY MEDICAL EXPENSES UNLESS AND UNTIL THIS FORM IS SIGNED AND TREATMENT IS AUTHORIZED BY [THE] OFFICE OF MEDICAL SERVICES.

From the date of the accident, when plaintiff was transported to the hospital by ambulance, to December 28, 2017, the Office of Medical Services approved all medical treatment requested by plaintiff, and the Port Authority Claims Department made direct payments on plaintiff's behalf totaling $819,111.72 in medical expenses. During that period, plaintiff treated with

4

various doctors and underwent various treatment modalities, including physical therapy, cortisone and epidural injections, as well as steroid, anti-inflammatory, and pain medications to relieve pain. Plaintiff also underwent four surgeries, including two cervical spine surgeries and a lumbar spine fusion surgery when the other treatment failed to provide relief. Although plaintiff's condition improved from the treatment, some of his limitations and disabilities were permanent. After plaintiff returned to work, he was placed on restricted duty which prevented him from performing many of the physical activities he had previously performed in his capacity as an operations examiner. Plaintiff also experienced functional limitations in his normal activities at home.

On July 7, 2015, plaintiff filed a personal injury complaint pursuant to FELA, 45 U.S.C. § 51-60, alleging that his injuries, caused by "defective metal shelving [falling] on top of him," were a result of defendant's "negligence and failure to provide [plaintiff] with a safe place to work." A seven-day jury trial was conducted on non-consecutive days from January 30 to February 8, 2018. During the trial, in addition to producing the deposition testimony of Dr. Charles Gatto, Dr. Kevin Finnesey, and Dr. John Capo, three orthopedic surgeons who treated plaintiff, plaintiff called Ronald A. Fermano, an expert in the field of architecture and facility safety. Fermano opined that defendant departed from

5

accepted industry standards in the way that the shelving unit was assembled and/or maintained.[2] Plaintiff also produced William Harris, a forensic economist, who testified regarding plaintiff's past lost wages, future loss of earning capacity, and cost of future medical treatment, quantifying those losses as follows:

> 1) $89,895 for past loss of earnings to date;
> 2) $124,865 for future loss of overtime pay;
> 3) $778,580 for future loss of pay if no longer employed
> by PATH; and
> 4) $530,500 for future medical treatment.

Throughout the trial, the admission of the past medical expenses paid by defendant prior to trial in conjunction with the methodology for setting off the payment were hotly contested. As to the set-off, plaintiff and defendant proposed conflicting methodologies for the calculation. Regarding the past medical expenses, on the first day of trial, with defense counsel's consent, plaintiff's attorney informed the judge that the parties stipulated "to the amount" paid for plaintiff's past medical expenses, and "[t]he parties . . . stipulated and agreed that the medical treatment received by plaintiff to date [was] . . .

---

[2] Defendant countered Fermano's testimony with its own expert in mechanical engineering and accident reconstruction, Dr. Ali Saeegh. Saeegh opined that the shelving could not have fallen over on its own, but rather someone or some other external force contributed to the shelving unit falling.

medically necessary and causally related to the subject incident." The judge agreed to present the stipulation to the jury. However, two days later, defense counsel withdrew the stipulation, except for the amount paid for plaintiff's medical expenses.

Plaintiff asserted that defendant was legally bound by the stipulation and argued that the stipulation and the medical bills should be admitted into evidence because the expenses were directly related to the issue of causation and the credibility of the defense in contesting causation.[3] Plaintiff explained that the past medical expenses constituted "an item of damages" just "like any other item of dam[ages]," and "it would be more confusing if [the jury] didn't hear about it," because then plaintiff would be "putting in a claim for future medicals" without presenting anything "about past medicals." Defendant countered that since the parties stipulated to the amount, it was unnecessary for the jury to be informed of the expenses. Further, according to defendant, any evidence of defendant's prior payment of plaintiff's past medical expenses was prejudicial to defendant because the payments were not recoverable by plaintiff and had no

[3] In its defense, defendant claimed that plaintiff suffered from pre-existing injuries.

bearing on any other damages at issue in the case. According to defendant, the speculation and confusion alluded to by plaintiff "goes both ways."

As to the stipulation and the past medical expenses, the judge agreed with defendant and ruled that there was "no need to put th[e] stipulation on the record in front of the jury" as the past medical bills were "not . . . probative of . . . future medical [expenses]" and were "not probative of proximate cause." The judge explained that there was "no need . . . to read a stipulation to a jury on an issue that they're not going to consider, [or] a number they're not going to see."[4] As to the handling of the set-off, the judge agreed with plaintiff to apply the set-off only "to the medical expenses," rather than "any future pain and suffering award." Therefore, according to the judge, the pre-paid medical expenses would be added to any verdict and then reduced by that amount in order to apply the set-off. Any comparative fault found by the jury would then be applied to the net. The judge explained that such an approach would avoid any "double recovery" or "under compensation of the injured party."

---

[4] In fact, in the final charge, the judge instructed the jurors that although they "heard testimony regarding [p]laintiff's medical treatment from the time of the accident to the present time," they were "not to consider or speculate about the amount of the cost associated with the treatment or how those costs have been paid."

On February 8, 2018, the jury returned a verdict totaling $939,000, attributing fifty percent negligence to defendant and fifty percent to plaintiff. The jury specified the damages awarded as follows:

1) $89,000 for past lost wages;[5]
2) $500,000 for future lost wages;
3) $250,000 for future medical expenses; and
4) $100,000 for pain and suffering.

Following the verdict, in accordance with the judge's prior decision regarding the methodology for the calculation of the set-off, the judge molded the award to a final judgment of $469,500.

Thereafter, defendant moved pursuant to Rule 4:49-2 to alter or amend the judgment in accordance with its previously proposed methodology for calculating the set-off. On March 16, 2018, following oral argument, the judge denied the motion, finding no legal basis to reconsider his earlier decision. In an oral decision from the bench, the judge posited there was no dispute about defendant's "entitle[ment] to a set-off," only whether the set-off should be applied before or after plaintiff's comparative fault. The judge found all the

---

[5] Prior to trial, defendant had paid plaintiff $121,700.93 in wage supplementation, but appears to have abandoned any claim to a set-off of this amount.

cases defendant relied upon to support its position "factually distinguishable" from this case.

In rejecting defendant's proposal for calculating the set-off,[6] the judge explained that his earlier ruling was "appropriate under . . . FELA." To support his decision, the judge relied heavily on the fact that the stipulated damages of $819,111.72 for past medical expenses "was not before the jury in any way, shape, or form." Considering "the nature of the payments made in th[e] case in conjunction with the . . . specific awards by the jury, the ultimate outcome charge that was given to the jury, and what the jury knew and [did not] know[,]" the judge concluded that his calculation was "the most appropriate and fair and just way to apply the set-off" that was not "inconsistent with the statute or contrary to law." The judge entered memorializing orders, and this appeal followed.

On appeal, defendant argues that "FELA's statutory provisions governing damages expressly do not provide for a windfall, which is what [p]laintiff would receive under the trial court's decision." Defendant asserts "[i]t is an absurd and

---

[6] Notably, at oral argument, defense counsel agreed with the judge that if there was no comparative fault assigned to plaintiff, then the final award to plaintiff would have been $939,000, calculated by adding the pre-paid medical expenses to the jury verdict, then subtracting that amount to apply the set-off, resulting in a net of $939,000.

unjust result to find that, because [p]laintiff's total damages are reduced by his own negligence, [defendant's] set-off based on its payment of 100% of his medical bills must also be reduced [by] [fifty percent]." According to defendant, instead, "FELA's contributory negligence and set[-]off provisions should be read together and [p]laintiff's award should be reduced on a dollar-for-dollar basis."

"We review questions related to statutory interpretation de novo, without affording any deference to the trial court." MEPT Journal Square Urban Renewal, LLC v. City of Jersey City, 455 N.J. Super. 608, 622 (App. Div. 2018). "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). "We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (citations omitted).

"A court should not 'resort to extrinsic interpretative aids' when 'the statutory language is clear and unambiguous, and susceptible to only one interpretation . . . .'" Ibid. (quoting Lozano v. Frank DeLuca Const., 178 N.J. 513, 522 (2004)). "On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to

extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" Id. at 492-93 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)). "We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language." Id. at 493. To discern the Legislature's intent, the statute's plain language is therefore the starting point. Patel v. N.J. Motor Vehicle Comm'n, 200 N.J. 413, 418 (2009).

In pertinent part, FELA provides that:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery . . . or other equipment.
>
> [45 U.S.C. § 51.]

"FELA generally provides the exclusive federal tort remedy for railroad employees seeking to recover for personal injury sustained in the course of employment." Andrews v. Norfolk S. R.R. Corp., 77 N.E.3d 1028, 1032-33 (Ill. App. Ct. 2017). "State and federal courts share concurrent jurisdiction over FELA actions." Id. at 1033 (citing 45 U.S.C. § 56). However, "[w]here, as here, a FELA action is adjudicated in state court, it's governed by state procedural

law, but federal substantive law." Ibid. (citing St. Louis Sw. Ry. Co. v. Dickerson, 470 U.S. 409, 411 (1985)). "[Q]uestions concerning the measure of damages in a FELA action are federal in character" and such "is true even if the action is brought in state court." Norfolk & W. Ry. Co. v. Liepelt, 444 U.S. 490, 493 (1980).

FELA "supplant[s] a patchwork of state legislation with a nationwide uniform system of liberal remedial rules, displac[ing] any state law trenching on the province of the Act." S. Buffalo Ry. Co. v. Ahern, 344 U.S. 367, 371 (1953). "It establishes a rule or regulation which is intended to operate uniformly in all the States, as respects interstate commerce, and in that field it is both paramount and exclusive." Erie R. Co. v. Winfield, 244 U.S. 170, 172 (1917). "[T]he general congressional intent" in enacting FELA "was to provide liberal recovery for injured workers" and a flexible remedy "to meet changing conditions" affecting the railroad "industry's duty towards its workers." Kernan v. Am. Dredging Co., 355 U.S. 426, 432 (1958). In that regard, FELA seeks to adjust the cost of injury "equitably between the worker and the [railroad]," Sinkler v. Mo. Pac. R.R. Co., 356 U.S. 326, 329-30 (1958), to "stimulate" railroad companies "to greater diligence for the safety of their employees," Jamison v. Encarnacion, 281 U.S. 635, 640, (1930), to protect the health of employees, Urie

13                                                                                    A-3750-17T2

v. Thompson, 337 U.S. 163, 191 (1949), and to promote the public interest. Minneapolis, St. P. & S.S.M. Ry. Co. v. Rock, 279 U.S. 410, 413, (1929).

"To further [the Act's] humanitarian purposes, Congress did away with several common-law tort defenses that had effectively barred recovery by injured workers." Conrail v. Gottshall, 512 U.S. 532, 542 (1994). "As cataloged in Gottshall, . . . FELA 'abolished the fellow servant rule'; 'rejected the doctrine of contributory negligence in favor of . . . comparative negligence'; 'prohibited employers from exempting themselves from . . . FELA through contract'; and . . . 'abolished the assumption of risk defense.'" Norfolk, 538 U.S. at 145 (quoting Gottshall, 512 U.S. at 542-543); see 45 U.S.C. §§ 51-55. Thus, FELA is to be construed liberally, so that the primary purpose of the legislation may be more readily effectuated. Atchison, Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 562 (1987); see Gottshall, 512 U.S. at 543 (noting courts "have liberally construed FELA to further Congress' remedial goal").

The FELA set-off provision codified at 45 U.S.C. § 55 was primarily designed to bar the various schemes that railroads had contrived to exempt themselves from paying full damages for employee injuries, including pre-injury liability releases and contractual stipulations that an employee's acceptance of benefits from the employer's relief fund would amount to a release and

14

satisfaction of all claims against the railroad. See Duncan v. Thompson, 315 U.S. 1, 5-6 (1942); see also Philadelphia, Baltimore & Washington RR. Co. v. Schubert, 224 U.S. 603, 612-13 (1912). To that end, the FELA set-off provision ensured that the railroad's liability under FELA "survived the acceptance of benefits," while "permitting a set-off of any sum the company had contributed toward any benefit paid to the employee." Schubert, 224 U.S. at 613. Thus, the FELA set-off provision has twin aims; it "allow employers to set off money paid to an injured employee because of his or her injury" and prevents employers from "seeking to totally avoid liability." Clark v. Burlington N., Inc., 726 F.2d 448, 451 (8th Cir. 1984).

These twin aims are codified in pertinent part within the plain language of the FELA set-off provision which provides that:

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by . . . [FELA], shall to that extent be void: Provided, That in any action brought against any such common carrier under or by virtue of any of the provisions of . . . [FELA], such common carrier may set[-]off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought.
>
> [45 U.S.C. §55.]

15

FELA's set-off provision "operate[s] in this context to create an exception to the 'collateral source' rule," Wendelboe v. SeaRiver Mar., Inc., 950 So. 2d 826, 828 (La. Ct. App. 2006).

> The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor. Married to this substantive rule is an evidentiary rule that proscribes introduction of evidence of collateral benefits out of a concern that such evidence might prejudice the jury.
>
> [Davis v. Odeco, Inc., 18 F.3d 1237, 1243 (5th Cir. 1994).]

"The rationale for this exception is to protect an employer that has purposefully sought to indemnify itself against double liability by providing a self-funded plan to compensate workers for injuries that may lead to litigation." Wendelboe, 950 So. 2d at 828. "Assuming such a plan or fund is proper and fair, FELA allows an employer to credit plan payments against any recovery in tort so that the plaintiff does not recover doubly." Ibid. (citing Clark, 726 F.2d at 450). When an employer drafts a plan that is clearly consistent with FELA's twin aims "to provide a means by which employees can receive employer assistance and compensation for their injuries" and provide employers with "an

16

incentive to provide such benefits while protecting themselves against double payment obligations," then "'the employer's manifest intent to avoid double liability in offering . . . [a] plan[] must be respected if the collateral source rule is not to swallow up 45 U.S.C. § 55 at the ultimate expense of employees.'" Id. at 830-31 (quoting Clark, 726 F.2d at 451).

Here, it is undisputed that the injury report plaintiff signed on the date of the incident is consistent with the twin aims of FELA because it provides a means by which plaintiff could recover immediate payment for his medical expenses while ensuring that defendant would not face double liability in any subsequent litigation. Likewise, because defendant, and not a third party, pre-paid plaintiff's past medical expenses, the collateral source rule rationale does not apply to bar defendant from seeking a full set-off for the payment. However, as the judge pointed out, if defendant were permitted to offset its liability for pain and suffering, lost wages, and future medical expenses by monies paid for past medical expenses, when those expenses were neither considered by nor presented to the jury, then plaintiff would be left undercompensated for his losses and defendant would be permitted to exempt itself from liability contrary to the express language of 45 U.S.C. § 55.

Because there are no controlling cases governing the correct methodology for calculating FELA's set-off provision, defendant relies on other state and federal cases to support its position. However, these cases are neither controlling, nor binding on New Jersey courts. See State v. Warriner, 322 N.J. Super. 401, 407 (App. Div. 1999) (reviewing a federal district court and an out-of-state decision and noting that "[w]hile neither decision is binding on this court, we find them persuasive"). Moreover, as the judge here astutely pointed out, these cases are factually distinguishable "in terms of the nature of the award, what the jury was told, the damages that were presented to the jury, [and] how the set-off [was] to be applied."

For example, in Clark, the plaintiff employee brought an action under FELA against the Burlington Northern Railroad claiming damages for injuries sustained while working as a foreman. 726 F.2d at 449. The jury found the plaintiff "ten percent negligent and awarded him $171,121.21." Ibid. Subsequently, the trial court "reduced the jury award by $47,268.21 because of disability payments and advances [the defendant] made to [the plaintiff] before trial." Ibid. The Eighth Circuit affirmed the trial court's decision, finding that it "correctly credited th[e] amount against the final verdict to prevent double recovery." Id. at 451. However, the court noted that "[u]nder the disability

18

plans, [the plaintiff] had already received a percentage of his lost wages" and "[t]he jury undoubtedly considered the stipulated lost wages in calculating a damage award." Ibid.

In Eversole v. Consol. Rail Corp., the plaintiff employee's $140,000 jury verdict in his FELA lawsuit was reduced to $19,600 because he was found eighty-six percent contributorily negligent. 551 N.E.2d 846, 849 (Ind. Ct. App. 1990). Subsequently, the defendant railroad company was granted a $17,466.93 set-off against the judgment "for sickness and insurance benefits previously received by [the plaintiff]," further reducing plaintiff's damage award to $2434.80. Ibid. The defendant's payment of supplemental benefits was governed by a collective bargaining agreement providing that "benefits paid under this Plan will be offset against any right of recovery for loss of wages the employee may have against the employing railroad" and "a recovery which does not specify the matters covered thereby shall be deemed to include a recovery for loss of wages to the extent of any actual wage loss due to the disability involved." Id. at 855. In affirming the judgment, the Indiana Court of Appeals explained that notwithstanding the fact that the jury returned a general verdict, "evidence of lost wages was placed before the jury. Absent any contrary

indication, it is reasonable to assume the jury considered this evidence in calculating its damage award."  Ibid.

Similarly, in Washington v. Atchinson, Topeka & Santa Fe Ry. Co., after the plaintiff employee successfully sued the defendant railway company under FELA, "[t]he jury found [the] defendant to be eight percent at fault and [the] plaintiff ninety-two percent at fault, and . . . awarded plaintiff $263,444.75 in damages in a general verdict that the trial court reduced by ninety-two percent to account for plaintiff's comparative negligence."  834 P.2d 433, 434-35 (N.M. Ct. App. 1992).  Subsequently, the defendant was granted a set-off against the judgment for benefits the plaintiff previously received pursuant to a collective bargaining agreement that "specifically provided for an offset of benefits paid under the plan in the event of recovery for lost wages by an employee against the railroad."  Id. at 435.

In affirming the judgment, the New Mexico Court of Appeals explained:

> Under the collective bargaining agreement, defendant was also entitled to reimbursement for sickness benefits up to the amount plaintiff was awarded in lost wages. Since the jury's award to plaintiff was a general one, the concluding sentence in the applicable paragraph of the collective bargaining agreement comes into play: "[A] recovery which does not specify the matters covered thereby shall be deemed to include a recovery for loss of wages to the extent of any actual wage loss due to the disability involved."  Here, because plaintiff

20

claimed lost wages in the amount of $150,000 to $255,000, the trial court correctly granted defendant a set-off of $8473.09 -- the amount paid to plaintiff in sickness benefits. To hold otherwise would permit the unjust enrichment of plaintiff at defendant's expense and would violate the policy considerations counseling against disclosure of insurance and partial payment of a claim, and it could conceivably have an undesirable chilling effect on the employer's willingness to award voluntary prejudgment payments.

[Id. at 437 (citations omitted).]

In contrast, here, the jury returned a specific damages award and could not consider past medical expenses in calculating its award because the evidence was never presented to the jury. As proposed by defendant, reducing the jury verdict to account for plaintiff's fifty percent comparative negligence, and then further reducing the award by defendant's pre-paid medical expenses to account for the set-off would result in an unfair and unjust award to plaintiff, and would exempt defendant from liability for plaintiff's pain and suffering, lost wages, and future medical expenses. On the other hand, under the methodology adopted by the judge, defendant faces no double liability for past medical expenses because those expenses were not considered by the jury or included in the jury verdict which explicitly delineated the damages awarded.

Contrary to defendant's argument, to untether the injury report signed by plaintiff from the proofs presented at trial and the evidence considered by the

jury would be inconsistent with the twin aims of the FELA set-off provision, and would allow defendant to totally avoid liability for plaintiff's pain and suffering, lost wages, and future medical expenses. Because the congressional intent in enacting FELA is "to provide liberal recovery for injured workers," Kernan, 355 U.S. at 432, and the legislation is to be construed liberally in order to effectuate FELA's aims, Atchison, 480 U.S. at 562, we agree with the judge's rejection of defendant's proposed methodology for calculating the set-off and we see no basis to intervene.

To the extent we have not addressed a particular argument, it is because either our disposition makes it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3750-17T2